Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL VIII

| | | |
|---|---|---|
| CONSEJO DE TITULARES DEL CONDOMINIO BOSQUE DEL RIO<br><br>APELADO<br><br>v.<br><br>MULTINATIONAL INSURANCE COMPANY<br><br>APELANTE | TA2026AP00135 | *Apelación* procedente del Tribunal de Primera Instancia, Sala Superior de Carolina<br><br>Caso Núm. TJ2020CV00013<br><br>Sobre: Incumplimiento de Contrato |

Panel integrado por su presidenta, la Juez Lebrón Nieves, el Juez, Pagán Ocasio y la Jueza Álvarez Esnard.

Pagán Ocasio, juez ponente

# **SENTENCIA**

En San Juan, Puerto Rico, a 4 de junio de 2026.

## **I.**

El 9 de febrero de 2026, Multinational Insurance Company (Multinational o la parte apelante) presentó digitalmente un recurso de *Apelación* donde solicitó que revoquemos la *Sentencia* emitida el 30 de diciembre de 2025, notificada y archivada el 8 de enero de 2026, por el Tribunal de Primera Instancia, Sala Superior de Carolina (TPI).[1] En el referido dictamen, el TPI acogió, en su totalidad, el informe rendido por un Comisionado Especial asignado. En su consecuencia, declaró Ha Lugar la demanda presentada por el Consejo de Titulares del Condominio Bosque del Río (Consejo o parte apelada).

---

[1] Véase entrada núm. 143 del expediente digital del caso en el Sistema Unificado de Manejo y Administración de Casos del Tribunal de Primera Instancia (SUMAC-TPI).

El 10 de febrero de 2026, emitimos una Resolución a través de la cual concedimos al Consejo hasta el 11 de marzo de 2026, para presentar su alegato en oposición.[2]

El 11 de marzo de 2026, la parte apelada presentó su *Alegato en Oposición a Apelación,* en el que solicitó que se confirme la *Sentencia.*[3] A su vez, el mismo día, presentó su *Solicitud de Autorización para presentar Alegato en Oposición a Apelación en Exceso de Páginas.*[4] El 13 de marzo de 2026, emitimos una Resolución en donde autorizamos la presentación del recurso en exceso de páginas.[5]

Con el beneficio de la comparecencia de las partes, damos por perfeccionado el recurso y procederemos a discutir los hechos pertinentes a la controversia ante nuestra consideración.

**II.**

El caso de marras tiene su génesis el 16 de enero de 2020, cuando el Consejo presentó una demanda titulada *"Complaint"* contra Multinational, donde reclamó indemnización por los daños ocasionados por el huracán María.[6] El Consejo solicitó cubierta bajo la póliza emitida por Multinational (núm. 88-CP-000313008-1) (la Póliza) en favor del Condominio ubicado en la Carretera 876, kilómetro 0.3, Trujillo Alto, Puerto Rico, 00976, que cubría la estructura del Condominio por un límite agregado de veintinueve millones, ciento seis mil, seiscientos setenta y seis dólares ($29,106,676.00), y un deducible del 2% del valor de la propiedad asegurado, para tormenta de viento. Como consecuencia del Huracán María, el Condominio sufrió varios daños generados por los vientos y lluvia.

---

[2] Véase entrada Núm. 2 del expediente digital del caso en el Sistema Unificado de Manejo y Administración de Casos del Tribunal de Apelaciones (SUMAC-TA).
[3] Íd., entrada núm. 3.
[4] Íd., entrada núm. 4.
[5] Íd., entrada núm. 5.
[6] Véase entrada núm. 1 en el SUMAC-TPI.

Pasado el evento atmosférico, el Consejo presentó una reclamación ante Multinational, la cual fue asignada el número 318070. Según las alegaciones, Multinational asignó a un ajustador interno para el manejo de la reclamación. El 9 de abril de 2018, a siete (7) meses del siniestro, y a varios meses luego de que presuntamente se presentó la reclamación, Multinational le comunicó a Consejo que, a base de su evaluación, el total de su reclamo ascendía a $31,271.98, cantidad que Consejo rechazó. Luego del rechazo del Consejo, Multinational re-ajustó su estimado a $36,271.98 el 5 de septiembre de 2018. En ambas instancias, Consejo alegó que Multinational les remitió un "proof of loss", en donde se requería su firma.

Luego de otros trámites, la demanda relata que el 20 de noviembre de 2019, Multinational le representó a Consejo que la cantidad a la cual tenían derecho bajo la Póliza ascendía a $142,161.28. Dicha cuantía carecía de fundamento alguno, según consignó el Consejo en sus alegaciones. El Consejo respondió a dicha oferta y afirmó que la aceptarían como pago en adelanto de la restante indemnización a la cual tenían derecho, conforme a la cubierta de la Póliza y a la normativa legal sobre seguros aplicable. El Consejo luego alegó que recibió un pago de $140,000.00 el 10 de abril de 2019. Ante la presunta negativa de Multinational de investigar y atender propiamente la reclamación del Consejo, estos últimos se vieron en la obligación de contratar a unos consultores privados, quienes valoraron los daños en $8,792,727.97. En virtud de lo anterior, el Consejo entabló la referida demanda.

Transcurridos varios trámites procesales, el 21 de agosto de 2020, el TPI emitió una *Sentencia Parcial,* donde desestimó la reclamación al amparo del artículo 27.125 del Código de Seguros,

*infra.*[7] Tras recibir una *Moción de Reconsideración* y sus respectivas réplicas, el 24 de septiembre de 2020, el foro primario emitió una *Sentencia Parcial Nunc Pro Tunc,* confirmando la desestimación de la causa de acción bajo el Código de Seguros.[8] Se recurrió de dicha determinación, que fue confirmada por un panel hermano de este Tribunal.[9]

El 30 de agosto de 2020, Multinational presentó su *Contestación a Demanda.*[10] Dentro de sus alegaciones, Multinational afirmó que recibieron la reclamación núm. 318070 en septiembre de 2017, sin embargo, alegaron no haber recibido los estimados de reparación de los edificios. Dichos estimados, según su escrito, fueron recibidos el mes de julio de 2019, e incluían presuntamente daños sobrevalorados. Multinational atribuyó su tardanza en realizar ofertas a esta demora en la entrega de los estimados. Entre otras cosas, adujo como defensa afirmativa que el Consejo no mitigó daños; que los daños fueron exagerados, especulativos, infundados y excesivos, y que Multinational no actuó de forma temeraria, dolosa fraudulenta, culposa o negligente.

Una vez recibido el mandato de este Tribunal, se reiniciaron los procedimientos.[11] El 12 de enero de 2023, el Consejo presentó una *Moción Solicitando Designación de Comisionado(a) Especial,* en donde le peticionó al foro primario que designara a algún Comisionado Especial, conforme a la Regla 41 de las Reglas de Procedimiento Civil, *infra.* Además, anejó los *curriculum vitae* de cuatro posibles candidatos a comisionados.[12] Tras varios trámites procesales, el 6 de febrero de 2023, Multinational presentó una *Moción en Cumplimiento de Orden y en Solicitud de Término,* donde

---

[7] *Véase* entrada núm. 19 en SUMAC-TPI.
[8] Íd., entrada núm. 31.
[9] Ver **Council of Owners Bosque del Rio Condominium v. Multinational Insurance Company**, KLAN202000920.
[10] *Véase* entrada núm. 21 en SUMAC-TPI.
[11] Entrada núm. 51.
[12] Íd., entrada núm. 81.

indicó que se allanaban al nombramiento de un comisionado especial, pero se reservaban el derecho a oponerse a cualquier candidato en particular.[13]

Luego de varios trámites procesales adicionales, el 3 de abril de 2023, el TPI emitió una *Orden sobre Designación de Comisionado Especial*, en donde designó al ajustador público Luis Esteves como Comisionado Especial y le detalló la encomienda.[14] En dicha orden, se le precisó al Comisionado Especial que tendría que rendir un informe, en el que debería incluir:

> 1) Un desglose detallado del valor de los daños a "la propiedad" ocasionados por el huracán María el 20 de septiembre de 2017;
> 2) Determinaciones sobre el ajuste de los daños conforme a la prueba que se le presente por las partes en torno a los términos, límites asegurados, condiciones y exclusiones de la póliza expedida por Multinational Insurance Company;
> 3) Un resumen de la prueba evaluada, considerada y excluida, previa determinación de este Tribunal; y,
> 4) Una relación de determinaciones de hechos.

Además, mediante la referida orden, el TPI le concedió al Comisionado Especial amplias facultades para celebrar reuniones, ordenar y llevar a cabo vistas evidenciarias, recibir toda prueba pertinente para la rendición del informe, ordenar la producción de prueba documental o testifical, entre otras facultades cónsonas con la Regla 41, *infra*.

Tras varios trámites procesales, el 24 de marzo de 2025, Consejo presentó una *Moción presentando informe del comisionado especial*, en donde sometieron: (1) el informe preliminar del Comisionado Especial, (2) el Informe Final del Comisionado Especial y (3) una cadena de correos electrónicos entre las partes.[15] El TPI luego notificó el *Informe Final* mediante una *Orden*.[16] En el Informe Final, el Comisionado Especial acreditó haber fundamentado su

---

[13] Íd., entrada núm. 89.
[14] Íd., entrada núm. 105.
[15] Íd., entrada núm. 121.
[16] Íd., anejo 1, entrada núm. 128.

determinación en los informes periciales presentados por las partes, las deposiciones de ambos peritos, las vistas celebradas y, también, de "los reportes de expertos involucrados anteriormente en el caso".[17] A partir de un examen de la prueba recibida, el Comisionado Especial concluyó que el total de daños causados por María ascendía, en bruto, a $1,327,665.30, que luego de reducir el deducible aplicable, resultaba en un monto de $776,425.72. Una vez restado los $140,000.00 pagados en adelanto, quedaba un monto de $636,425.72.

El Informe Final detalla pormenorizadamente tanto los procedimientos sostenidos, como la prueba presentada por ambas partes, y sus alegaciones sobre cada partida que evaluó el Comisionado Especial. Luego de dicha aseveración, el funcionario reseñó, por cada tipo de daño, la posición de las partes, y su opinión, a partir de la prueba examinada. Tras dicha exposición, el Comisionado Especial incluyó una tabla con el resumen de sus estimados y los pagos recomendados por cada edificio afectado.[18] El Comisionado Especial concluyó su informe con una serie de comentarios, atendiendo las observaciones de ambas partes al informe preliminar.

El 16 de junio de 2025, tras otros trámites procesales, Multinational sometió una moción notificando sus objeciones al informe final del Comisionado Especial.[19] Junto a su escrito, el apelante anejó, entre otras cosas, la Póliza y un informe de impugnación. Luego de otros trámites procesales, el Consejo presentó su oposición a las objeciones de Multinational.[20] El Consejo señaló, *inter alia*, que el informe de impugnación que había

---

[17] Íd., anejo 2, entrada núm. 121.
[18] Íd., en la pág. 35.
[19] Íd., entrada núm. 128.
[20] Íd., entrada núm. 134. El título del escrito es *Oposición A: "Moción de Multinational Insurance Company Notificando Objeciones al Informe del Comisionado Especial"*.

sometido Multinational no había sido presentado ante el Comisionado, por lo cual no debió de ser considerado por el TPI.[21]

Consecuentemente, tras recibir para su consideración el informe del comisionado y escritos de ambas partes, el foro primario celebró una *Conferencia sobre el estado de los procedimientos* el 5 de noviembre de 2025, en donde las partes tuvieron amplia oportunidad de presentar sus argumentos cuanto al Informe Final.[22] Como parte de los procedimientos, el Tribunal ordenó al Comisionado Especial a que hiciera una actualización de los precios por inflación.[23] El 13 de noviembre de 2025, Consejo sometió una *Moción en Cumplimiento de Orden*, donde anejó el documento trabajado por el Comisionado Especial, el cual contenía el ajuste por inflación.[24]

El 8 de enero de 2026, el foro primario notificó la *Sentencia* emitida el 30 de diciembre de 2025, donde acogió, en su totalidad, el Informe Final del Comisionado Especial y declaró Ha Lugar la *Demanda*.[25] El TPI adoptó las determinaciones de hechos que realizó el Comisionado Especial, las cuales fueron:

1. Multinational Insurance Company es una compañía de seguros, organizada, autorizada y existente conforme a las leyes del Estado Libre Asociado de Puerto Rico.

2. Multinational Insurance Company emitió una Póliza a favor del Consejo de Titulares para asegurar al Condominio Bosque del Río.

3. La póliza ofrecía cubierta para la propiedad conocida como Asociación de residentes del condominio Bosque del Rio, ubicada en la Carr. # 876 Km. 0.3 Trujillo Alto, P.R. 00976.

4. El Condominio consiste en 5 edificios de 4 pisos cada uno, tipo walk up con un total de 155 unidades de apartamentos residenciales.

5. El periodo de vigencia de la póliza era de 29 de agosto del 2017 al 29 de agosto del 2018.

---

[21] Íd., en la pág. 6.
[22] *Véase* entrada núm. 139 en SUMAC-TPI, contentiva de la Minuta de los procedimientos.
[23] Íd.
[24] Íd., entrada núm. 140.
[25] Íd., entrada núm. 142.

6. Según las declaraciones de la póliza, la cubierta, la cual tenía un límite agregado de $32,561,656.00 dividido de la siguiente manera:

| Localización | Límites | Deducible |
|---|---|---|
| Building 1 | $6,534,368.00 | $130,687.36 |
| Building 2 | $4,388,706.00 | $87,774.12 |
| Building 3 | $5,563,302.00 | $111,266.04 |
| Building 4 | $6,394,837.00 | $127,896.74 |
| Building 5 | $4,680,766.00 | $93,615.32 |
| Building 6 Parking | $652,277.00 | $13,045.54 |
| Building 7 Swimming pool | $35,616.00 | $712.32 |
| Building 7 Pavement | $75,000.00 | $1,500.00 |
| Building 7 Vehicular Gates | $17,808.00 | $356.16 |
| Building 8 Guard house | $15,000.00 | $300.00 |
| Building 8 Electric transformer | $75,000.00 | $1,500.00 |
| Building 8 fences | $185,000.00 | $3,700.00 |
| Building 9 pool fences | $14,276.00 | $285.52 |
| Building 9 wooden fence | $7,823.00 | $156.46 |
| Building 9 galvanized fence | $10,176.00 | $203.52 |
| Building 9 trash rec. | $14,276.00 | $285.52 |
| Building 10 light poles | $23,278.00 | $465.56 |
| Building 10 retaining walls | $307,188.00 | $6,143.76 |
| Building 10 playground equipment | $8,500.00 | $170.00 |
| Building 11 gazebo & bathrooms | $44,900.00 | $898.00 |
| Building 11 fences steel | $9,875.00 | $197.50 |
| Buildng 11 exterior flood lamps | $6,000.00 | $120.00 |
| Building 12 gate arms w/motors | $6,372.00 | $127.44 |
| Building 12 traffic detector | $3,110.00 | $62.20 |
| Building 12 mailboxes | $13,860.00 | $277.20 |
| Building 12 wheel stops | $9,267.00 | $185.34 |
| Building 13 moneky bar | $3,650.00 | $73.00 |
| Building 13 surveilance system | $4,425.00 | $88.50 |
| Building 13 park benches | $2,000.00 | $40.00 |
| Other coverages | | |
| Claims preparation | $50,000.00 | $250.00 |
| Extra expense | $250,000.00 | $250.00 |
| Ordinance of law | $3,000,000.00 | $250.00 |
| Pollutant cleanup | $150,000.00 | $1,000.00 |
| Water backup | $5,000.00 | $500.00 |

7. La Póliza tiene un deducible de dos por ciento (2%) para "tormentas de viento" (conocida como windstorm).

8. La Póliza es una póliza de tipo "a todo riesgo" (conocida como all risk), por lo que cubre todo tipo de daño a la propiedad asegurada, a menos que el tipo de daño esté expresamente excluido.

9. La Póliza expedida a favor del Consejo de Titulares se compone de varias secciones. La hoja de declaraciones sirve como un resumen del resto de la Póliza. A lo anterior, le sigue el índice de los formularios, y luego los formularios y endosos que contienen los términos de la Póliza.

10. La hoja de declaraciones de la Póliza contiene una descripción de la propiedad asegurada con su ubicación, el periodo de vigencia, número de póliza y la prima, y límites y deducibles para cada cubierta, entre otros detalles generales.

11. A grandes rasgos, la cubierta de propiedad comercial cubre daños a las estructuras y equipos que componen la propiedad asegurada, causados por alguno de los eventos cubiertos por la Póliza.

12. Las causas de pérdida cubiertas son aquellas causas que provocan que se active la obligación de indemnizar y están descritas en la Póliza.

13. La Póliza requiere reparar, reconstruir, reemplazar la propiedad dañada "with other property of the like kind and quality".

14. El huracán María impactó a Puerto Rico el 20 de septiembre de 2017.

15. El huracán María causó daños en el Condominio Bosque del Río.

16. Oportunamente, el 5 de diciembre de 2017, el Consejo de Titulares presentó una reclamación ante Multinational Insurance Company por los daños que sufrió el Condominio Bosque del Río a raíz del huracán María.[26]

17. El número de la reclamación del Consejo de Titulares, asignado por Multinational, es el núm. 318070.

18. El 9 de abril de 2018, Multinational Insurance Company notificó al Consejo de Titulares un ajuste de la reclamación reconociendo que le debe al Consejo de Titulares la suma de $31,271.98 por concepto de la reclamación luego de aplicado el deducible correspondiente, sujeto a la deducción de adelantos previos.

19. El 10 de abril de 2019, Multinational Insurance Company pagó un adelanto de $140,000 al Consejo de Titulares.

---

[26] El foro primario indicó sobre este hecho que: "Luego de examinar el expediente este Tribunal determina que el Consejo presentó su reclamación a Multinational como consecuencia de los daños sufridos por el huracán María el 5 de diciembre de 2017".

20. Los daños causados por el huracán María en el Condominio Bosque del Río, según estimados en el Informe Final del Comisionado Especial, ascienden a $1,708,236.61, lo que, luego de aplicado el deducible y demás términos y condiciones de la Póliza y del adelanto correspondiente, resulta en una cantidad neta, pagadera al Consejo de Titulares, de $1,016,997.03.

21. Según las determinaciones del Comisionado Especial en su Informe Final, la siguiente tabla detalla estas cantidades y la aplicación de Póliza en cuanto a los deducibles por localización:

| Localización (Building) | Límites | Comisionado | Deducible | Cantidad Neta |
|---|---|---|---|---|
| Building 1 | $6,534,368.00 | $283,951.47 | $130,687.36 | $153,264.11 |
| Building 2 | $4,388,706.00 | $158,261.80 | $87,774.12 | $70,487.68 |
| Building 3 | $5,563,302.00 | $264,503.84 | $111,266.04 | $153,237.80 |
| Building 4 | $6,394,837.00 | $244,987.76 | $127,896.74 | $117,091.02 |
| Building 5 | $4,680,766.00 | $185,762.17 | $93,615.32 | $92,146.85 |
| | SubTotal | $1,137,467.04 | | |
| Other coverages | | $29,045.00 | | $29,045.00 |
| Other coverages | | $88,651.92 | | $88,651.92 |
| Special classes | several | $72,501.34 | $0.00 | $66,121.63 |
| **TOTALS** | | **$1,327,665.3** | | **$776,425.7** |

22. Luego de revisado según solicitado por este Honorable Tribunal, los números finales actualizados por el Comisionado Especial por los daños ocasionados por el huracán María al Consejo suman $1,708,236.61.

23. Después de la deducción por los deducibles aplicables al edificio y de los Special Classes, aplicables bajo los términos de la Póliza, la cantidad neta del reclamo es por $1,156,997.03. Finalmente, el Comisionado Especial determinó que a esa cifra se le debe restar los pagos iniciales de $140,000, para un pago final de $1,016,997.03.

Tras exponer el derecho aplicable al caso ante sí, el TPI determinó que las determinaciones del Comisionado Especial no eran claramente erróneas, por lo cual eran meritorias de deferencia judicial, conforme a la Regla 41.5, *infra*. Además, el TPI resolvió:

[N]o variar determinación alguna en cuanto a la credibilidad que el Comisionado le otorgó a los peritos de las partes ya que la encontró confiable, justa y razonable como parte de un análisis juicioso por parte del Comisionado sobre las metodologías y criterios utilizados por los peritos al inspeccionar el Condominio,

identificar daños y realizar el análisis correspondiente.[27]

En virtud de lo anterior, el TPI concluyó que Multinational "no cumplió con sus deberes al amparo de la Póliza y el Código de Seguros".[28] Por ello, le impuso al apelante el pago de la cantidad identificada por el Comisionado Especial, con el ajuste por inflación incorporado. Además, le impuso intereses por mora, lo cual resultó en una cuantía ascendente a $516,411.59. A lo anterior, el foro primario sumó una partida por honorarios, al amparo del Artículo 27.165 del Código de Seguros, *infra*. Para determinar cuál sería una cantidad razonable, el foro primario observó cuantías aplicadas en pleitos al amparo de la Ley Núm. 100 del 1959, *infra*, y tomó como fundamento la norma expuesta en ***Belk Arce v. Martínez***, 163 DPR 196 (2004), a los fines de que cuando una parte se haya enfrentado a una "defensa hostil", se puede justificar una cantidad mayor de honorarios. Con esas consideraciones, el TPI impuso una partida de $506,024.84 en concepto de honorarios.[29] La misma constituyó un 33% del monto de la *Sentencia*. Con ello, el TPI ordenó el pago total de $2,039,433.46.

Inconforme con este proceder, el apelante presentó el recurso de epígrafe, donde le imputó al foro primario la comisión de los siguientes errores:

> **Primer señalamiento de error:** Incidió el TPI al incluir en su *Sentencia* honorarios de abogados.
> **Segundo señalamiento de error:** Incidió el TPI al incluir en su *Sentencia* intereses por mora.
> **Tercer señalamiento de error:** Incidió el TPI al incluir en su *Sentencia* un aumento por inflación.
> **Cuarto señalamiento de error:** Incidió el TPI al incluir en su *Sentencia* intereses por mora simultáneamente con un aumento por inflación.
> **Quinto señalamiento de error:** Incidió el TPI al determinar que MIC tenía una obligación de pago.
> **Sexto señalamiento de error:** Incidió el TPI al determinar que MIC tenía que resolver la reclamación para el 10 de enero de 2018.

---

[27] *Véase* entrada núm. 142, pág. 21, en SUMAC-TPI.
[28] Íd.
[29] Íd., en la pág. 24.

**Séptimo señalamiento de error:** Incidió el TPI al concluir que el trato de MIC fue injusto, carente de razonabilidad, que MIC forzó al Consejo a presentar la demanda, que MIC no cumplió con sus obligaciones al amparo de la póliza y el Código de Seguros, y que entabló una defensa hostil.

**Octavo señalamiento de error:** Incidió el TPI al no considerar las objeciones específicas de MIC al informe del Comisionado Especial.

En síntesis, alegó que el foro primario erró en imponer la cuantía por honorarios, ya que dicha dicho remedio se solicitó al amparo de la Ley 247 del 2018, *infra*. Señaló el apelante, sobre este particular, que el foro primario había desestimado previamente la causa de acción que tenían los apelados al palio del Código de Seguros, por lo cual estaba impedido de otorgar el pago de honorarios. Además, arguyó que estaban ausentes los requisitos para la imposición del pago de la mora, por lo que el TPI estaba igualmente vedado de prescribir dicha sanción.

Por otra parte, el apelante esgrimió que el foro primario obró contrario a derecho al ordenar el ajuste de inflación, dado a que este mandato contradecía el estado de derecho vigente. Particularmente, adujo el apelante que la cláusula de valoración de la Póliza establecía, sin ambages, que los daños se valorarían al momento de la pérdida, por lo que no había cabida para alterar dicho mecanismo.

A su vez, el apelante expuso que entendió que el foro primario erró al encontrar que tenían una obligación de pago. Esto, en apretada síntesis, dado a que la Póliza requería que el asegurado reemplazara el bien asegurado previo a poder cobrar el valor de reemplazo que garantizaba la Póliza y que el ordenamiento, en materia de seguros, no apoya lo resuelto.

Adicional a lo anterior, el apelante arguyó que falló el foro *a quo* en concluir que este había incumplido con sus deberes bajo el Código de Seguros. De igual modo, sostuvo que no había entablado una defensa hostil y que, finalmente, el foro primario debió acoger sus objeciones al Informe Final del Comisionado Especial.

El 11 de marzo de 2026, la parte apelada presentó su *Alegato en oposición.* En el mismo sostuvo que el TPI no cometió los señalamientos de error. En consecuencia, solicitó que se confirmase la *Sentencia* apelada.

**III.**

**A**.

A manera de excepción, y no como norma general, la Regla 41.1 de Procedimiento Civil, permite que el Tribunal encomiende a un Comisionado Especial un asunto, cuando están involucradas cuestiones sobre cuentas y cómputos difíciles de daños o casos que involucren cuestiones sumamente técnicas o de un conocimiento especial altamente especializado. Regla 41.1 de las Reglas de Procedimiento Civil, 32 LPRA Ap. V, R.41.1; ***Mayagüez Hilton Corp. v. Betancourt***, 156 DPR 234, 258 (2002).

La Regla 41.1 de Procedimiento Civil, *supra,* regula todo lo concerniente al nombramiento de un Comisionado Especial. En esencia, establece que el Tribunal "en el que esté pendiente un pleito o procedimiento podrá nombrar un comisionado o una comisionada especial en relación con dicho pleito o procedimiento". Íd. Así, el Comisionado se considera como un funcionario designado por el Tribunal, en quien se delega determinados poderes para que formule ciertas determinaciones o conclusiones en un procedimiento activo. R. Hernández Colón, *Práctica jurídica de Puerto Rico, Derecho Procesal Civil*, 5ta ed. revisada, LexisNexis de Puerto Rico, 2010, sec. 3701, pág. 356. "El propósito en la designación de un comisionado especial consiste en facilitar la labor judicial". Íd., sec. 3702, pág. 357. Por tanto, "[l]a designación de un comisionado es para asistir al juzgador, no para reemplazarlo". J. Cuevas Segarra, *Tratado de Derecho Procesal Civil*, 2da ed., Publicaciones J.T.S. 2011, T. III, pág. 1199.

Por su parte, la Regla 41.2 de Procedimiento Civil, *supra*, R. 41.2, dispone acerca de la encomienda delegada al comisionado especial. Al respecto, estatuye que, la encomienda deberá estar relacionada con "cuestiones sobre cuentas y cómputos difíciles de daños o casos que involucren cuestiones sumamente técnicas o de un conocimiento pericial altamente especializado". Íd. En cuanto a la orden en que se establezcan los poderes delegados al Comisionado Especial, la Regla 41.3 de Procedimiento Civil, supra, prescribe:

> La orden para encomendar un asunto a un comisionado o comisionada especificará con particularidad sus poderes y requerirá que informe sobre determinadas cuestiones litigiosas solamente, que haga determinados actos o que solamente reciba prueba y transmita el expediente de esta, y fijará un término razonable dentro del cual el comisionado o la comisionada deberá presentar su informe. Sujeto a las especificaciones y limitaciones establecidas en la orden, el comisionado o la comisionada tendrá y ejercitará el poder de regular los procedimientos en toda vista celebrada ante él o ella, y de realizar cualquier acto y tomar cualquier medida que sea necesaria o adecuada para el cumplimiento eficiente de sus deberes bajo la orden. […].

Lo importante es que la encomienda hecha al Comisionado sea clara y que los poderes otorgados estén inequívocamente expresados en la orden que lo designa. ***Meléndez v. Levitt & Sons of P.R.,*** 104 DPR 895, 902-903 (1976). "El comisionado debe tener presente que él está para ayudar al tribunal; él no es el tribunal. Él rinde un informe; **el juez es quien decide y dicta sentencia**". Íd., págs. 903-904 (énfasis suplido).

En ocasiones, donde la *orden* no establezca limitaciones más allá de las normas procesales, se entiende que el Comisionado ha recibido la encomienda de informar sobre todos los asuntos de hechos y de derecho que contenga el pleito. Las cuestiones de hechos y de derecho deberán someterse en el correspondiente informe. Para la consecución de la encomienda, la Regla 41.4 de Procedimiento Civil, supra, R.41.4 dispone que el Comisionado

Especial podrá valerse de la celebración de reuniones, citación de testigos, examen oral y solicitud de evidencia documental.

En cuanto al rol del Tribunal, este "**aceptará las determinaciones de hechos del comisionado o de la comisionada, a menos que sean claramente erróneas**". Íd. (Énfasis nuestro). El procedimiento contempla también un término para que las partes notifiquen sus objeciones al informe rendido. Íd.

> [...] **El tribunal, después de oír a las partes, podrá adoptar el informe, modificarlo o rechazarlo en todo o en parte, recibir evidencia adicional o devolverlo con instrucciones.** [...] Íd. (Énfasis suplido).

Así, el Tribunal se guiará por la siguiente norma: no descartará las determinaciones fácticas, a menos que sean evidentemente incorrectas, y resolverá las objeciones presentadas. Para ello, podrá devolver el Informe al Comisionado con instrucciones. Hernández Colón, *op. cit.*, sec. 3706, pág. 359. En lo atinente al caso de epígrafe, el tratadista Cuevas Segarra expresa lo siguiente:

> El tribunal debe señalar una vista para dilucidar las objeciones, a menos que no la estime necesaria. [...] **Pero en ausencia de demostración de prejuicio, parcialidad o error manifiesto de parte del Comisionado Especial al apreciar la prueba, el Tribunal no alterará las determinaciones de hechos que este haga**. [...] Cuevas Segarra, *op. cit.*, pág. 1215 (citas suprimidas y enfasis súplido).

Nuestro Tribunal Supremo, en casos disciplinarios, ha establecido una norma de deferencia a las determinaciones de hechos que realiza un Comisionado Especial. *In re Velez Carreras*, 2026 TSPR 29, pág. 53; *In re Bermudez Melendez*, 198 DPR 900, 908-909 (2017); *In re Soto Charraire*, 186 DPR 1019, 1029 (2012). Aunque dichas expresiones se realizaron en el contexto disciplinario y no interpretando la Regla 41, *supra*, resultan pertinentes para una justipreciación adecuada del estatuto ante nuestra consideración.[30]

---

[30] El nombramiento y las funciones de un Comisionado Especial en el contexto disciplinario se encuentra regulado por las Reglas 14 y 51 del Reglamento del

Con relación a lo anterior, el Tribunal Supremo ha expuesto que dicha norma de deferencia "se circunscribe exclusivamente a aquellos asuntos relacionados con testimonios orales vertidos en su presencia, por haber sido este quien observa la actitud de los testigos, su forma de declarar, sus gestos, y en general, su conducta al prestar declaración". *In re Bermúdez Meléndez*, supra, pág. 909 (cita omitida). No obstante, al tratarse de prueba documental, el foro revisor está en la misma posición que el Comisionado. *In re Ortiz Brunet*, 152 DPR 542, 549 (2000). En ese sentido, es una deferencia análoga a aquella que aplica a las determinaciones de hechos de los tribunales de instancia, ya que el papel que desempeña el Comisionado es semejante al del juez de instancia. *In re Barreto Cintrón*, 2026 TSPR 17, pág. 17. *Véase* también J.A. Cuevas Segarra, *op. cit.*, pág. 1215 ("El Comisionado ocupa el papel de juzgador de instancia, por lo que está en mejor posición para aquilatar la prueba testifical").

**B.**

El Código Civil del 1930 estableció en nuestro ordenamiento jurídico, mediante el artículo 1503, los intereses por mora.[31] 31 LPRA ant. sec. 3017. "[s]e entiende por mora … el retraso en el cumplimiento de la obligación". Castán Tobeñas, *Derecho Civil Español: Común y foral*, Madrid, Editorial Reus, Tomo 3, págs. 236-237 (1992). El referido artículo pauta que "[i]ncurren en mora los obligados a entregar o hacer alguna cosa desde que el acreedor les exija judicial o extrajudicialmente el cumplimiento de su obligación…". Artículo 1503 del Código Civil, *supra.*

---

Tribunal Supremo de Puerto Rico, In re Aprobación Enmdas. Regl. TS, Resolución ER-2023-0001 aprobada el 14 de junio de 2023, 2023 TSPR 74, 212 DPR ___ (2023).

[31] Tomamos conocimiento judicial de que el Código Civil de 1930 fue derogado mediante la Ley Núm. 55-2020. No obstante, aplicamos el Código Civil de 1930, el cual se encontraba vigente al momento en que se presentó la demanda en el caso de marras.

Del citado texto, se desprende que solamente pueden incurrir en mora quienes hayan pactado una obligación de entregar o de hacer, y esto solamente desde el momento en que el acreedor exija el cumplimiento de la obligación. Como destaca la doctora García Cárdenas, "es importante tener claro **que el mero e individual retraso en el cumplimiento no da pie automáticamente a la mora**". García Cárdenas, _El Nuevo Derecho de Obligaciones y Contratos: Código Civil 2020_, San Juan, MJ Editores, 1era ed., pág. 293 (2021) (énfasis suplido).

El Tribunal Supremo, fundamentándose en la doctrina civilista, ha identificado cinco requisitos para la aplicación de dicha doctrina: "(1) una obligación de dar o hacer; (2) que el acreedor requiera el cumplimiento al deudor judicial o extrajudicialmente; (3) que la obligación sea exigible y líquida, y esté vencida; (4) que el retraso sea imputable al deudor, y (5) que el retraso en cumplir se haya producido por la culpa del deudor". **_Asociación de Salud Primaria y otros v. ELA_**, 2025 TSPR 75, resuelto el 8 de agosto de 2025, pág. 7.[32] En resumidas cuentas, la jurisprudencia ha sumado dos requisitos los que establece el Código Civil: que la deuda sea líquida y que el retraso en el cumplimiento de la obligación sea atribuible a conducta del deudor.

Una "deuda es líquida por ser cierta y determinada". **_Rio Mar Community Asoc. v. Mayol Bianchi_**, 208 DPR 100, 108 (2021); **_Ramos de Ramos de Szendrey v. Colón Figueroa_**, 153 DPR 534, 546 (2001). Los tratadistas españoles Luis Díez Picaso y Antonio Gullón han explicado que una deuda no es líquida "[e]n todos los casos en que falte una cantidad concreta que reclamar por no existir acuerdo entre las partes sobre su monto, se requiere la intervención judicial, que en sentencia la determinará". Luis Díez-Picazo y

---

[32] 216 DPR ____ (2025). Ver también **_Consejo Titulares v. MAPFRE_**, 2024 TSPR 140, 215 DPR ____ (2024).

Antonio Gullón, *Sistema de Derecho Civil*, Madrid, Editorial Tecnos, 2016, Tomo I, Vol. II, págs. 192 (2016). Atinente a lo anterior, añade Castán Tobeñas que "no puede estimarse la morosidad de las obligaciones que consisten en pago de cantidad cuando la determinación de ésta dependa de un juicio previo encaminado a precisarla...". Castán Tobeñas, *op. cit.*, en la pág. 238.

## C.

En nuestro ordenamiento jurídico, los negocios de seguros están revestidos con el más alto interés público debido a su importancia, complejidad y su efecto tanto en la economía como en la sociedad. ***Consejo Titulares v. MAPFRE***, 208 DPR 761, 773 (2022). Esta industria está regulada mediante la Ley Núm. 77 de 19 de junio de 1957, conocida como Código de Seguros de Puerto Rico, 26 LPRA sec. 101 et seq., según enmendada.

Resulta palmario que nuestro Código de Seguros fue cimentado en disposiciones federales y estatales de Estados Unidos en materia de seguros. Cónsono con lo anterior, es norma reiterada por nuestro Tribunal Supremo que:

> [A]l resolver controversias sobre interpretación de cláusulas de pólizas de seguros, las normas de derecho angloamericano **son de gran valor persuasivo** en nuestra jurisdicción, ello porque las pólizas de seguro que se mercadean en Puerto Rico, de ordinario, son modelos semejantes o idénticos a las que venden las compañías de seguros de los Estados Unidos. (Énfasis nuestro). ***Echandi Otero v. Stewart Title***, 174 DPR 355, 378 (2008).

Por otra parte, nuestro Tribunal Supremo ha reiterado que los seguros juegan un papel económico vital tanto a nivel individual como en el ámbito comercial, ya que permite a las personas y a los negocios, proteger sus recursos al transferir el impacto monetario de ciertos riesgos a cambio del pago de una prima. ***Maderas Tratadas v. Sun Alliance Ins. Co.***, 185 DPR 880, 896-897 (2012).

El contrato de seguros es definido como "aquel por el que una persona se obliga a indemnizar otra si se produce un suceso incierto

previsto". Art. 1.020 del Código de Seguros, *supra, sec. 102*. En ese contexto, "constituye un acuerdo donde una parte se compromete a compensar a otra por una pérdida ocasionada a causa de una contingencia en particular". ***Savary et al. v. Mun. Fajardo et al.***, 198 DPR 1014, 1023 (2017). En otras palabras, "a cambio del pago de una prima, se transfiere el riesgo de un evento específico a la aseguradora, quien viene obligada a cubrir los daños económicos por los que el asegurado esté llamado a responder". Íd.; ***Viruet et al. v. SLG Casiano-Reyes***, 194 DPR 271, 278 (2015). Conforme lo anterior, "la función primordial de una póliza de seguro es establecer un mecanismo para transferir un riesgo y de esta manera proteger al asegurado de ciertos eventos identificados en el contrato de seguro". Íd.; ***R.J. Reynolds v. Vega Otero***, 197 DPR 699, 707 (2017). Es por ello que la asunción de un riesgo de pérdida y el compromiso de asegurar contra dicha pérdida son requisitos esenciales de un contrato de seguro. ***OCS v. CODEPOLA***, 202 DPR 842, 859 (2019). A su vez, como norma general, otra de las características esenciales de las pólizas de seguro es la obligación de indemnizar. Íd. "Indemnizar se define como la acción de resarcir de un daño o perjuicio". Íd. (Cita omitida).

La póliza configura el documento escrito donde se plasman los términos que rigen el contrato de seguro. ***Rivera Matos, et al v. Triple-S et al.***, 204 DPR 1010, 1020 (2020); ***R.J. Reynolds v. Vega Otero***, supra, pág. 707. Véase, además, el Art. 11.140 del Código de Seguros, *supra*. En otras palabras, los términos que componen el contrato de seguro están contenidos en la póliza. Íd. Los términos de una póliza de seguros se entenderán claros cuando el lenguaje utilizado sea específico, sin que de margen a dudas, ambigüedades o esté sujeto a distintas interpretaciones. ***Rivera Matos, et al v. Triple-S et al.***, supra.

Siendo una materia revestida de alto interés público, el Código de Seguros establece la forma en que se interpretarán los contratos de seguros. Artículo 11.250 del Código de Seguros, supra, sec. 1125; *Rivera Matos, et al v. Triple-S Propiedad, Inc.,* supra. Particularmente, dispone el Código de Seguros que: "[t]odo contrato de seguro deberá interpretarse globalmente, a base del conjunto total de sus términos y condiciones, según se expresen en la póliza y según se hayan ampliado, extendido, o modificado por aditamento, endoso o solicitud adherido a la póliza y que forme parte de ésta. Artículo 11.250 del Código de Seguros, *supra*; *Echandi Otero v. Stewart Title*, pág. 369. Además, "corresponde interpretar el lenguaje plasmado en la póliza en su acepción de uso común general, sin ceñirse demasiado al rigor gramatical". *Rivera Matos, et al v. Triple-S et al.*, supra, pág. 1020 (subrayado nuestro). Asimismo, las cláusulas del contrato de seguros deberán examinarse desde "la óptica de una persona normal de inteligencia promedio". Íd. De esa forma, podemos asegurarnos de que quien adquiere la póliza reconoce cuál es el alcance de esta. Íd.

En la interpretación de los contratos de seguro, las normas generales del Código Civil "aplicarán sólo de manera supletoria". *Echandi Otero v. Stewart Title*, supra, pág. 369. En otro extremo, no podemos perder de perspectiva que "el contrato de seguro es un contrato de adhesión, por lo cual debe interpretarse liberalmente en beneficio del asegurado". *Monteagudo Pérez v. E.L.A.*, 172 DPR 12, 21 (2007). Ahora bien, cuando los términos de un contrato de seguro son claros, específicos y no dan lugar a ambigüedades o a distintas interpretaciones, se hará valer la voluntad de las partes. Íd.

**D**.

Ante las múltiples violaciones por parte de las compañías aseguradoras a las disposiciones del Código de Seguros, supra, la Asamblea Legislativa de Puerto Rico (Asamblea Legislativa) añadió

los Artículos 27.164 y 27.165 al Código mediante la promulgación de la Ley Núm. 247-2018, 26 LPRA sec. 2716d *et seq.* Esto, con el fin primordial de brindar herramientas y protecciones adicionales en beneficio de los asegurados para garantizar el fiel cumplimiento de los fines del Código de Seguros y, así, agilizar el proceso de recuperación de Puerto Rico ante el paso de los huracanes Irma y María. Exposición de Motivos, Ley Núm. 247-2018, 2018 LPR 247. A su vez, la Asamblea Legislativa entendió que era indispensable establecer parámetros que garantizaran una respuesta apropiada y oportuna por parte de las aseguradoras, para beneficio de los asegurados. Íd.

Cónsono con los anteriores fines, ambos articulados proveen para la concesión de honorarios por parte de las aseguradoras. ***Consejo Titulares v. MAPFRE,*** 2024 TSPR 140*,* 215 DPR \_\_\_ (2024). El inciso uno (1) del Artículo 27.165, supra, sec. 2716e establece que:

> Al recaer una sentencia o decreto por cualquiera de los tribunales contra un asegurador y en favor de cualquier asegurado nombrado o el beneficiario designado bajo una póliza o contrato ejecutado por el asegurador, el **Tribunal de Primera Instancia o, en el caso de una apelación en la que prevalezca el asegurado o beneficiario, el tribunal de apelación**, **deberá adjudicar o decretar contra el asegurador y a favor del asegurado o el abogado del beneficiario una suma razonable como honorarios o compensación** por haber procesado la demanda en la que se obtuvo una recuperación. Artículo 27.165, *supra* (énfasis suplido).

En otras palabras, una vez se decide un pleito en contra de un asegurador, el tribunal con jurisdicción sobre el caso está compelido a otorgar una "suma razonable" en concepto de honorarios.

El Tribunal Supremo se enfrentó a la controversia de si la Ley 247-2018, *supra,* era de aplicabilidad retroactiva en el caso de ***Consejo Titulares v. MAPFRE***, 208 DPR 761 (2022). Tras examinar el historial legislativo del estatuto, resolvió nuestro más alto foro que

"la Ley Núm. 247-2018 aplica retroactivamente a las reclamaciones relacionadas a los huracanes Irma y María, tales como las del caso de autos. Disponer lo contrario derrotaría el propósito de esta ley. Así, hacemos expreso lo que la Asamblea Legislativa dispuso de forma tácita". Íd., en la págs. 772-773.

**E.**

El Capítulo 27 del Código de Seguros, regula las prácticas desleales y fraudulentas. De este marco regulatorio surge un deber del asegurador de ser diligente en la atención de las reclamaciones de los asegurados. Dicho deber incluye la obligación de certificar que ha sido notificado de una reclamación de parte de un asegurado. Artículo 27.150 del Código de Seguros, *supra,* sec. 2714a. Entre otras cosas, el artículo 27.162 del Código de Seguros, *supra,* sec. 2716b, prescribe lo siguiente:

> (1) La investigación, ajuste y resolución de cualquier reclamación se hará en el período razonablemente más corto dentro de noventa (90) <u>días después de haberse sometido al asegurador la reclamación</u>.
> (2) En el caso de que un asegurador no pueda resolver una reclamación en el término establecido en el inciso (1) de este Artículo, deberá mantener en sus expedientes los documentos que acrediten la existencia de justa causa para exceder el término anteriormente dispuesto.
> (3) El Comisionado en cualquier momento podrá ordenar la resolución inmediata de cualquier reclamación si considera que se está dilatando o retrasando indebida e injustificadamente la resolución de la misma. Subrayado nuestro.

Asimismo, el Art. 27.163 del Código de Seguros, supra, dispone los métodos para resolver una reclamación:

> (1) El pago total de la reclamación.
> (2) La denegación escrita y debidamente fundamentada de la reclamación.
> (3) El cierre de la reclamación por inactividad del reclamante, cuando el reclamante no coopere o no entregue la información necesaria para que el asegurador pueda ajustar la reclamación. Disponiéndose que el asegurador notificará inmediatamente al reclamante del cierre de la misma, salvo que en tales circunstancias el cierre será sin perjuicio de permitir nuevamente la presentación de dicha reclamación.

En otras palabras, el asegurador tiene una obligación de responder a la reclamación dentro de noventa (90) días de haberla recibido, salvo que media justa causa. El asegurador, a su vez, tiene el mandato de conservar la documentación relacionada a las circunstancias que hayan provocado la demora en la contestación a la reclamación.

**IV.**

En el recurso de epígrafe, el apelante impugna la *Sentencia* del foro primario que acogió, en su totalidad, el informe del Comisionado Especial designado. Tras un análisis objetivo, sereno y cuidadoso del recurso, adelantamos que procede modificar y confirmar el dictamen apelado. Veamos.

Debemos consignar que la evaluación de la mayoría de los señalamientos de error, requieren un análisis del articulado legal en materia de seguros y no de la póliza particular de este caso. No obstante, en los que se fundamenta algún error basado en la póliza, así lo analizaremos, conforme a la normativa legal y jurisprudencial aplicable.

El apelante alega como primer señalamiento de error, que el TPI incidió al imponerle un pago por honorarios como parte de la *Sentencia.* Como séptimo señalamiento de error, aduce que el foro primario se equivocó al determinar que habían sido injustos, irrazonables y hostiles en la presentación de su defensa. Por estar íntimamente relacionados ambos señalamientos, procedemos a discutirlos conjuntamente. Colegimos que el TPI no cometió el primer señalamiento de error, pero sí el séptimo.

Con relación a la imposición de los honorarios, el apelante afirma que el TPI fundamentó su decisión en las enmiendas al Código de Seguros producto de la Ley 247-2018, *supra.* No obstante, esgrime que dicho proceder fue incorrecto, dado a que la causa de acción bajo el Código de Seguros había sido desestimada con

perjuicio.[33] En específico, el apelante puntualiza que, en la *Sentencia Parcial* del 28 de septiembre de 2020, el TPI concluyó que la Ley 247-2018, *supra*, aplicaba de forma prospectiva. Un panel hermano de este Tribunal confirmó dicha determinación.[34]

Sin embargo, estas determinaciones fueron <u>previas</u> a que el Tribunal Supremo evaluara la retroactividad de la Ley 247-2018, *supra*, en **Consejo Titulares v. MAPFRE**, supra. Como reseñamos en el derecho precedente, allí nuestro más alto foro interpretó que la Ley 247-2018 aplicaba retroactivamente a reclamaciones que fuesen producto de los estragos de los huracanes Irma y María.

Por otro lado, resaltamos que la causa de acción que fue desestimada, con perjuicio, fue al palio del Artículo 27.164 del Código de Seguros, *supra*, lo cual ciertamente es la ley del caso. Sin embargo, las determinaciones previas del TPI y del panel hermano nada disponen en cuanto a los honorarios que otorga el Artículo 27.165, supra. Por ello, no nos vemos impedidos de dilucidar la aplicabilidad de dicho remedio al caso de marras. Conforme a lo resuelto por el Tribunal Supremo en **Consejo Titulares v. MAPFRE**, supra, colegimos que el artículo 27.125, supra, es de aplicabilidad al caso de autos, por lo cual el foro primario estaba facultado para otorgar dicho remedio.

Por otra parte, el apelante expone que el artículo 27.165, supra, no era aplicable al caso, por no mediar una sentencia "contra un asegurador y en favor de cualquier asegurado". Artículo 27.125, *supra*. Esto, dado a que, según los apelantes "M[ultinational] fue victorioso en este caso y el Consejo perdidoso".[35] Atinente a lo anterior, el apelante arguye que, dado a la diferencia entre la cuantía

---

[33] *Véase* entrada núm. 31, en SUMAC-TPI.
[34] **Council of Owners Bosque del Rio Condominium v. Multinational Insurance Company**, KLAN202000920.
[35] *Véase* entrada núm. 1, pág.12, en SUMAC-TA.

reclamada por el apelado y la cantidad otorgada en sentencia, debe de entenderse que la sentencia no fue a favor del Consejo.

El resumido argumento no nos persuade, toda vez que la *Sentencia* del TPI resolvió que "Multinational no cumplió con sus deberes al amparo de la Póliza y del Código de Seguros" y declaró Ha Lugar la *Demanda.*[36] El apelante cita el caso de **Autoridad Sobre Hogares de P.R. v. Colón**, 73 DPR 215 (1952), para fundamentar su posición. No obstante, dicho caso es distinguible del recurso ante nos. La referida opinión versa sobre un caso de expropiación forzosa, en la cual el TPI había declarado con lugar la demanda de expropiación, pero había impuesto un valor superior como justa compensación. En otras palabras, la parte perdidosa había perdido el título de su propiedad, más había resultado favorecido en la imposición de un pago mayor por justa compensación. Fue en ese contexto que el Supremo expresó que "la sentencia en parte se dictó a favor de la demandante y en parte a favor de los demandados". Íd., pág. 222. Muy distinto es el caso de epígrafe, en donde el foro primario declaró Ha Lugar una demanda por incumplimiento de contrato de seguro y condenó al apelante a pagar una suma por este. Por todo lo anterior, concluimos que no erró el foro primario al imponerle el pago de una partida por honorarios al amparo del Código de Seguros, *supra.*

Como parte de su primer señalamiento de error, el apelante impugna, por otro lado, el que se le haya impuesto una taza de 33% de honorarios. Para llegar a dicha cuantía, en primer lugar, el foro primario hizo referencia a jurisprudencia proveniente de pleitos laborales al palio de la Ley Núm. 100 del 30 de junio de 1959, 29 LPRA sec. 146 *et seq.* Dicha ley, al igual que el artículo 27.165 del Código de Seguros, *supra,* faculta al TPI a imponer una "suma

---

[36] *Véase* entrada núm. 143, pág. 21, en SUMAC-TPI.

razonable" en concepto de honorarios. En esos casos, al interpretar el lenguaje de la Ley Núm. 100, *supra,* el cual es semejante al del Código de Seguros, el Tribunal Supremo ha identificado que una partida ascendente al veinticinco (25) porciento es razonable. ***López Vicil v. ITT Intermedia, Inc.***, 143 DPR 574 (1997). Al foro primario le pareció razonable dicho porcentaje como base de partida.

Ahora, para aumentar dicha cuantía, el TPI utilizó el caso de ***Belk Arce v. Martínez***, supra, en donde el Tribunal Supremo expresó, *inter alia*, que casos donde la parte victoriosa se haya enfrentado a una defensa hostil, se justificaba una cantidad mayor de honorarios. ***Belk Arce v. Martínez***, supra. Adviértase que, el foro primario justificó la tasa porcentual en su determinación de que el apelante había sido hostil. Es precisamente esa determinación que se impugna en el séptimo señalamiento de error. Por ello, resulta prudente evaluar, en primera instancia, la corrección de la aludida determinación, para luego resolver si el foro primario abusó de su discreción al imponer unos honorarios de 33% del monto total en este caso.

En lo específico, el foro primario realizó la siguiente conclusión en su *Sentencia*:

> Por otra parte, la cantidad estimada por el Comisionado en el Informe Final, de manera imparcial y rigurosa, **excede por mucho la cantidad que Multinational estuvo dispuesta a reconocer en su ajuste de 2018**, previo a la Demanda. Este ajuste de 9 de abril del 2018 inclusive se produce a más de noventa (90) días de presentada la reclamación del Consejo de Titulares el 5 de diciembre de 2017. Ello es demostrativo que la valorización de daños de la aseguradora en ese entonces fue insuficiente, **y que el trato de Multinational hacia al Consejo de Titulares como asegurado fue injusto y carente de razonabilidad. Este Tribunal concluye que el Consejo de Titulares se vio obligado a presentar la Demanda para recuperar una cantidad mayor a la ofrecida por Multinational extrajudicialmente y que**, determinada esa cantidad mayor por el Comisionado Especial según las determinaciones de hecho que preceden, surge que

Multinational no cumplió con sus deberes al amparo de la Póliza y del Código de Seguros.[37] (Énfasis suplido).

En cuanto al párrafo citado, el apelante arguye que el foro primario falló en no poner en justo balance la complejidad del litigio, lo cual naturalmente provocó el retraso del pleito. También le imputa al TPI el no haber sopesado como correspondía la razonabilidad de sus defensas. Por su parte, los apelados aducen que el hallazgo de temeridad era una determinación fáctica del TPI que amerita nuestra deferencia y que el Código de Seguros, supra, lo exige.

Como cuestión de umbral, es importante aclarar que no estamos ante la imposición de honorarios por concepto de temeridad, sino ante la imposición de unos honorarios estatutarios, agravados (de alguna forma) por la presunta conducta contumaz de la parte perdidosa. Por ello, el TPI ejerció su facultad al palio del artículo 27.165, el cual le ordena a "adjudicar ... una **suma razonable** como honorarios o compensación por haber procesado la demanda en la que se obtuvo una recuperación". Artículo 27.165 del Código de Seguros, *supra.*

Tras un análisis objetivo, sereno y cuidadoso del expediente judicial, discrepamos del proceder del foro primario al aumentar el porcentaje por este concepto sin que mediase justificación para ello. De la *Sentencia* únicamente se desprende que la presunta hostilidad se evidencia en la diferencia entre el valor del ajuste, ofrecido por Multinational, y el valor estimado por el Comisionado Especial. No obstante, como señalamos anteriormente, la designación de un Comisionado Especial afirma la complejidad del pleito. Por ello, no puede penalizarse la defensa de la parte perdidosa por el mero hecho de haber resultado errónea su defensa. En virtud de lo anterior,

---

[37] Íd.

corresponde reducir el porcentaje utilizado para calcular los honorarios de 33% a 25%.

Habiendo resuelto lo anterior, procede que examinemos el segundo señalamiento de error. Allí, el apelante argumenta que erró el foro primario al imponerle el pago de intereses por mora. Acorde con el derecho antes citado, un deudor incurre en mora cuando, *inter alia,* retrasa el pago de una deuda líquida, y dicho retraso no es imputable al acreedor. En este caso, Multinational reconoció que tenía una obligación para con el asegurado, no obstante, dilató indebida e injustificadamente el pago de la deuda. Así lo determinó el foro primario, y no apreciamos en su curso de acción causa para intervenir con su hallazgo. Los tribunales apelativos estamos impedidos de sustituir nuestro criterio por la apreciación del foro de instancia, de no mediar error manifiesto, pasión, prejuicio o parcialidad. ***Gómez Márquez et al. v. El Oriental***, 203 DPR 783, 793 (2020). Por ello, somos del criterio que no se cometió el segundo señalamiento de error.

En su tercer señalamiento de error, el apelante aduce que incidió el foro primario al incluir en su *Sentencia* un ajuste por inflación. En particular, Multinational esgrimió que dicha determinación era contraria a los términos claros de la Póliza, los cuales, en lo pertinente, establecían que la valoración de los daños se haría al momento de la pérdida como tal.[38]

Dicho señalamiento de error requiere que analicemos la Póliza, para luego determinar si la actuación del foro primario fue contraria a los términos claros pactados entre las partes. Reproducimos aquí, íntegramente, aquellas partes de la póliza

---

[38] *Véase la póliza en el* anejo 2, pág. 44, de la entrada núm. 128 en SUMAC-TPI. Prescribe: "We will determine the value of Covered Property in the event of loss or damage as follows: a. At actual cash value as of the time of loss or damage, except as provided in **b.** and **c.** below."

pertinentes a la controversia ante nuestra consideración, la que hemos examinado en su totalidad.

> [...]
> E. Loss Conditions[39]
> ...
> 4. Loss Payment[40]
> ...
> We will determine the value of lost or damaged property, or the cost of its repair or replacement, **in accordance with the applicable terms of the Valuation Condition in this Coverage Form or <u>any applicable provision which amends or supersedes the Valuation Condition</u>**.
> ...
>
> 8. Valuation[41]
> We will determine the value of Covered Property in the event of loss or damage as follows:
>> a. At actual cash value of the time of loss or damage, except as provided in b. and c. below.
> ...
> G. Optional Coverage[42]
> ...
> 3. Replacement Cost[43]
>> a. Replacement Cost (without deduction for depreciation) **<u>replaces Actual Cash Value in the Loss Condition, Valuation, of this Coverage Form</u>**.
> ...
>> e. We will not pay more for loss or damage on replacement cost basis than the least of (1), (2), or (3), subject to f. below:
>>> (1) The Limit of Insurance applicable to the lost or damaged property;
>>> (2) **The cost to replace the lost or damaged property with other property:**
>>>> (a) **Of comparable material and quality and**
>>>> (b) **Used for the same purpose**; or
>>> (3) The amount actually spent that is necessary to repair or replace the lost or damaged property... Énfasis subrayado nuestro.[44]

La parte apelante arguye que los términos de la póliza antes citada son claros a los fines de establecer que los daños se evalúan al momento de haberse sufrido la pérdida. Por ende, la actuación de

---

[39] Íd, pág. 42.
[40] Íd. pág. 43.
[41] Íd. pág. 44.
[42] Íd. pág. 46.
[43] Íd. pág.
[44] Íd. pág. 47.

imponer un ajuste por inflación supondría una enmienda judicial del contrato de seguro entre las partes. No le asiste la razón.

En nuestro ordenamiento jurídico, las pólizas de seguro deben interpretarse "globalmente, considerando el conjunto total de sus términos y condiciones según se expresan en la póliza, y según se hayan ampliado extendido o modificado por aditamento, endoso o solicitud adherido a la póliza y que forme parte de esta". Artículo 11.250 del Código de Seguros, *supra*. En virtud de dicha norma, no podemos analizar las cláusulas de las pólizas de manera aislada, sino que debemos de interpretarlas de forma integrada junto a las demás cláusulas aplicables.

Al evaluar cómo se ha de valorar cierto tipo de daño bajo la Póliza, debemos de comenzar con el inicio de la sección que cubre las pérdidas y sus pagos. En la sección "E" de la Póliza, la cual se titula *Loss Conditions*, se establece, en el cuarto inciso, que la determinación del valor de la pérdida o del daño se realizaría de acuerdo con los términos aplicables de la sección de Valoración o <u>cualquier provisión aplicable que enmiende o reemplace la Condición de Valoración</u>.[45] En otras palabras, la Póliza dispone, de al menos, dos maneras para evaluar el valor de los daños: (1) conforme a la sección de Valoración de la Póliza y (2) de acuerdo a cualquier otra provisión que enmiende o altere dicha sección de valoración.

Dentro de esa misma sección "E" de la Póliza, el octavo inciso contiene la sección de *Valoración* ("Valuation"). Allí prescribe que el valor del daño o la pérdida se calculará a partir del valor actual en efectivo ("actual cash value" o ACV) al momento de la pérdida o de sufrido el daño.[46] Es esta sección la que el apelante razona que es determinante e impide el ajuste por inflación. No obstante, como

---

[45] Íd., en la pág. 43.
[46] Íd., en la pág. 44.

reseñamos anteriormente, la propia Póliza prescribe que dicha sección aplicaría de <u>no haber otra sección posterior que enmiende o reemplace esta porción de la póliza</u>.

Más adelante, la Póliza incluye una sección intitulada "*Optional Coverage*". El tercer inciso de la referida sección establece todo lo relacionado al Costo de Reemplazo (*Replacement Cost* o RCV). En el subinciso "a" de dicha sección, la Póliza dicta que el *Replacement Cost* <u>reemplaza</u> lo relacionado a las pérdidas y la valoración de daños del *Actual Cash Value*.[47] Acto seguido, en el subinciso "d", la Póliza describe como se han de valorizar los daños en casos donde lo que se exija sea el valor del reemplazo o reparación del bien perdido. De interpretar estas cláusulas en conjunto con la cláusula que lee que la valoración de daños se hará conforme a cualquier provisión aplicable que "enmienda o reemplace" la sección de Valoración, podemos concluir que, en casos donde lo solicitado sea el costo de reemplazo, la valoración se hará conforme a lo que allí se disponga sobre el particular.

Aclarado lo anterior, corresponde evaluar si de la cláusula de valoración aplicable a RCV surge algún impedimento a la actuación del foro primario, y del Comisionado Especial, de ordenar el ajuste por inflación. Dicta la sección pertinente que el valor del daño en casos de RCV, se pagará: (1) el Límite del Seguro aplicable a la pérdida o daño, (2) el costo para reemplazar la pérdida o el daño con otra propiedad de semejante calidad y material o (3) la cantidad que se gastó para realizar el reemplazo o la reparación.[48]

El costo para reemplazar la pérdida no depende del momento en que se sufrió la pérdida, sino del momento en que se intenta reemplazar o reparar el bien. Como han comentado los tratadistas,

---

[47] Íd., en la pág. 46 ("Replacement cost ... replaces Actual Cash Value in the Loss Condition, Valuation, of this Coverage Form.").
[48] Íd., pág. 47.

el RCV está diseñado para permitir que el asegurado recupere el valor de la propiedad, sin tener que atribuirse la pérdida por deterioro o depreciación de la propiedad. Jordan R. Plitt *et al.*, *Couch on Insurance*, 6ta ed., 2026, §176:56 (en adelante, *Couch on Insurnace*).[49] En virtud de este principio, diversas cortes han determinado que el valor de reemplazo no puede ser el valor histórico, sino el costo necesario para ubicar al asegurado en la posición que ocuparía de no haber ocurrido el siniestro. *Couch on Insurance*, §176:58.[50] Ver también Randy R. Koenders, *Construction and effect of property insurance permitting recovery of replacement cost of property*, 1 A.L.R. 5th 817, §17: Historical Cost.[51]

Sobre este particular, Couch afirma que esta medida "casi necesariamente requiere que la fecha de la pérdida <u>no sirva como la fecha para medir los daños</u>, dado a que información necesaria puede bien no estar disponible hasta la fecha del reemplazo, imponiendo sobre el asegurado el precio de cualquier incremento en los costos de construcción". Íd. (Traducción y subrayado nuestro). Por su parte, el tratado de Appleman señala que el RCV típicamente hace referencia al costo que el asegurado razonablemente va a incurrir en

---

[49] Lee el tratado:

> While a standard policy compensating an insured for the actual cash value of damaged or destroyed property makes the insured responsible for bearing the cash difference necessary to replace old property with new property, replacement cost insurance **allows recovery for the actual value of property at the time of loss**, without deduction for deterioration, obsolescence, and similar depreciation of the property's value. **Thus, replacement cost insurance is designed to cover the difference between what property is actually worth and what it would cost to rebuild or repair that property**. (Énfasis suplido)

[50] Dicen allí los autores:

> Accordingly, the courts have faced various contentions as to what the concept means in practical measure terms and have determined that it does not mean historical cost, **but the cost needed to put the insured in the position which the insured would have occupied had the loss not occurred**. This almost necessarily requires that the date of loss not serve as the measurement date, as the necessary information may well not be available until the date of replacement, leaving the insurer to bear any increases due to rising construction costs. (Énfasis suplido).

[51] El American Law Report es una enciclopedia jurídica la cual reseña el desarrollo jurisprudencial de distintas áreas del derecho a través de las jurisdicciones de los Estados Unidos. Lo citamos aquí únicamente como fuente ilustrativa del desarrollo en otras jurisdicciones.

reparar o reemplazar una pérdida cubierta. Thomas & Randall, *New Appleman on Insurance Law Library Edition*, LexisNexis, Vol 5, 2014, §47.05. Igualmente destaca que una medida adecuada para el RCV es el costo implicado en la reparación y restauración de la propiedad a su condición original. Íd., §47.11.

Cónsono con lo antes expuesto, no identificamos impedimento en la Póliza a que el TPI impusiera un ajuste por inflación. Como señala la doctrina pormenorizada precedentemente, el fin del RCV es poder ubicar al asegurado en la posición donde hubiera estado previo al daño. En virtud de ello, la medida del RCV no puede fundamentarse en el costo histórico. Por ende, cuando la Póliza permite el pago del costo de reemplazar la propiedad dañada o perdida, no lo hace a partir de la fecha de la pérdida, sino del valor necesario para realizar el reemplazo o la reparación. La determinación del TPI de ordenar el ajuste por inflación no contradice los términos de la Póliza. Por todo lo anterior, concluimos que no se cometió el tercer error señalado.

Como cuarto señalamiento de error, el apelante esboza que incidió el foro primario al imponer un aumento por inflación y una partida de intereses por mora de manera simultánea. En suma, alega el apelante que esta medida fue ilegalmente acumulativa. No le asiste la razón.

Las partidas que el apelante señala no son acumulativas, debido a que surgen al amparo de dos disposiciones legales distintas y sirven propósitos diferentes. En primer lugar, el ajuste por inflación se incorpora como parte de la obligación que tiene el asegurador, en virtud de la Póliza existente entre las partes. Por otra parte, los intereses por mora surgen como una penalidad ante el incumplimiento de una obligación de dar. Para poder imponer una u otra partida, deben de concurrir distintos requisitos. Al no perseguir los mismos intereses, ni sancionar la misma conducta, no

podemos concluir, como nos solicita el apelante, que el foro primario impuso sanciones acumulativas. Por lo cual, no se cometió el cuarto señalamiento de error.

Resuelto lo anterior, procede discutir el quinto señalamiento de error. Allí, el apelante le imputó al TPI el haber errado al encontrar que tenían una obligación de pago. Particularmente, el apelante argumenta que no procedía la imposición del pago, dado a que el Consejo no había realizado ninguna reparación, lo cual era una condición pactada en la Póliza. Por su parte, el apelado aduce que Multinational no puede exigir cumplimiento del requisito de previa reparación, dado a que estos mismos habían impedido que el apelado pudiera reparar la propiedad. A su vez, los apelados razonan que Multinational renunció a las condiciones de la Póliza, al realizar el pago en concepto de adelanto, conforme a lo resuelto en *Carpet & Rug v. Tropical Reps*, 175 DPR 615 (2009).

Como señala la parte apelada, la controversia ante nuestra consideración es semejante a la que se enfrentó el Tribunal Supremo de Puerto Rico en *Carpet & Rug v. Tropical Reps*, supra. Dicho caso versaba sobre un asunto probatorio, dígase, de la admisibilidad de una carta que envió Integrand (la aseguradora) a Carpet & Rug en donde le informó un estimado de los daños sufridos. Íd., págs. 638-639. Además de tener que atender dicha interrogante, el Tribunal Supremo tuvo que evaluar la procedencia de una solicitud de sentencia sumaria. Como parte de su análisis, enfrentaron un argumento similar al que esgrime el apelante ante nos: que el incumplimiento del asegurado de reemplazar o reparar la propiedad perdida impedía que este recobrase del asegurador la cuantía reclamada.

Particularmente, en aquel caso, Integrand le había hecho a Carpet & Rug una oferta ascendente a $4,964,731.50, el cual se realizaría en dos pagos: (1) un primer pago de la mitad (50%) y (2) el

pago del restante, una vez estuviera sustancialmente terminada la obra de reconstrucción. Íd., en la pág. 623. Carpet & Rug aceptó parcialmente el pago ofrecido, e interpuso una objeción al precio ofrecido. Integrand nunca realizó el pago, lo cual desembocó en el pleito. Íd., en las págs. 623-624. Así las cosas, Carpet & Rug solicitó una sentencia sumaria, a la cual Integrand se opuso. Entre sus argumentos, adujeron que no había obligación de pago.

Cuando el Tribunal Supremo se enfrentó a este argumento, determinó que Integrand había renunciado a estas condiciones al realizar el pago sin haber exigido el cumplimiento de estas. Específicamente, nuestro más alto foro resolvió que:

> **Somos del criterio que Integrand renunció a estas condiciones de la póliza, por lo que está impedida de esgrimirlas para evitar el pago de la reclamación**. … Igual solución merece la condición sobre la cláusula de "Replacement Cost". Cierto es que dicha cláusula fue incluida en el acápite de "Optional Coverage" en las declaraciones, por lo que pasó a formar parte de las condiciones de la póliza. **Opinamos, sin embargo, que el pago ofrecido mediante la carta de 14 de abril de 2005 debió ser sujeto a dicha condición**. No fue así. En dicha carta, Integrand ofrece el pago inmediato del 50% del ajuste al que entendía tenía derecho Carpets & Rugs y el restante 50% se desembolsaría al completarse sustancialmente la obra ("Substantial Completion"). No menciona dicho ajuste la cláusula de "Replacement Cost" **por lo que entendemos que Integrand renunció a ésta al no condicionar el pago del ajuste ofrecido a la reconstrucción total del edificio**. Con el ajuste enviado, Integrand modificó la condición expuesta en la póliza, por lo que en este momento está impedida de actuar contra sus propios actos. Íd., en la pág. 643 (énfasis suplido).

En el caso de marras, Multinational ofreció y pagó al Consejo una cantidad total $140,000, como indemnización por los daños sufridos. Argumenta la apelante que dicho pago se realizó "en cumplimiento con sus obligaciones bajo el Código de Seguros" y que, previo a emitir el pago, "aplicó los términos y condiciones de la póliza".[52] Dicho pago no fue sujeto a ninguna de las condiciones de

---

[52] *Véase* entrada núm. 1, pág. 26, en SUMAC-TA.

la Póliza, a pesar de constituir la indemnización, según el ajuste realizado por el asegurador.

Es decir, de ser los $140,000.00 la cantidad debida al Consejo, el apelante debió exigir el cumplimiento de las condiciones previo a emitir el pago. Mediante dicha omisión, Multinational generó en el Consejo la expectativa real de que estaban dispuestos a realizar el pago <u>sin</u> que fuese necesaria la reparación previa. Ante esa realidad, es aplicable la conclusión a la cual llegó el Tribunal Supremo en ***Carpet & Rug v. Tropical Reps***, supra. Por ello, concluimos que Multinational renunció a las condiciones de la Póliza al ofrecer y realizar el pago de $140,000.00, sin sujetarlo a las condiciones de la póliza, como lo era haber realizado las reparaciones para exigir el pago. En virtud de todo lo anterior, concluimos que no se cometió el quinto señalamiento de error.

En su sexto señalamiento de error, el apelante arguye que erró el foro primario en establecer que habían tenido hasta el 5 de marzo de 2018 para resolver la reclamación de Consejo. Entre otras cosas, el apelante razona que, debido a que lo que recibió en diciembre del 2017 no era propiamente una reclamación, no surgió la obligación bajo el Código de Seguros, de cumplir dentro de 90 días. Además, argumenta el apelante que el Consejo no cumplió en producir toda la documentación necesaria para la resolución del caso. Por otro lado, impugna los fundamentos fácticos de la decisión del TPI en establecer la fecha límite, es decir, que el TPI no contaba con prueba para llegar a su conclusión. Adelantamos que no le asiste la razón.

En primer lugar, cabe destacar que el apelante impugna una determinación fáctica del TPI, sin proveer evidencia fehaciente, la cual merece nuestra deferencia. Esta Curia no reemplazará el criterio del foro primario de no mediar error manifiesto, pasión, prejuicio o parcialidad. ***Gómez Márquez et al. v. El Oriental***, supra. El apelante aduce que el foro primario se equivocó en dicha

determinación, no obstante, no reproduce ni presenta ante nos la reclamación original que recibió de parte de Consejo. Tampoco nos presenta prueba alguna que nos permitiese alterar el hallazgo del foro primario. Por lo contrario, del expediente digital ante el foro primario, se desprende que estos aceptaron que "en septiembre de 2017, la parte demandante [Consejo] presentó una reclamación a Multinational como consecuencia de los daños sufridos por el huracán María …". En otras palabras, de tomar su admisión como cierta, la fecha para la cual hubieran tenido que responder hubiera sido antes. A tenor con lo anterior, colegimos que el apelante no nos ha puesto en posición para revocar la determinación del foro primario sobre este particular.

Por otra parte, no nos persuade el argumento de que no medió una reclamación de parte de Consejo, por no haberse presentado la totalidad de los documentos requeridos. Como ha resuelto el Tribunal Supremo, "interpretar que el término de noventa (90) días corre a partir del momento en que se hayan presentado ante el asegurador todos los documentos necesarios para disponer de la reclamación desvirtuaría el claro propósito de esta legislación". *Comisionado Seguros P.R. v. Gen. Acc. Ins. Co.*, 132 DPR 543, 551 (1993). Por ende, la presunta falta de documentación no suspendía el efecto del término de noventa días prescrito por el Código de Seguros, *supra*. Por lo anterior, resolvemos que no se cometió el error señalado.

Finalmente, en su octavo señalamiento de error, Multinational alega que incidió el TPI al no considerar las objeciones que estos interpusieron ante el Informe Final del Comisionado Especial. No le asiste la razón.

En su sentencia, el foro primario destacó que "**debemos hacer hincapié en que evaluamos las objeciones interpuestas por Multinational al Informe Final y de estas no surge razón alguna**

**por la cual este Tribunal tuviera el ánimo de variar las determinaciones del Comisionado**. Multinational no demostró que las determinaciones del Comisionado sean claramente erróneas".[53] De dicha cita se desprende que el foro primario consideró y no adoptó las objeciones presentadas.

Cabe señalar que nada en la Regla 41, *supra*, exige que el foro primario revise las determinaciones del Comisionado Especial *de novo*. Al contrario, la referida regla solo ordena al foro primario evaluar las objeciones al informe del Comisionado bajo un estándar deferente y que deberá aceptar las determinaciones de hechos del comisionado, a menos que sean claramente erróneas. En este caso, no hay prueba alguna en el expediente que nos conduzcan a la conclusión de que el foro primario abdicó su responsabilidad. Igualmente, las determinaciones del Comisionado Especial son merecedoras de nuestra deferencia, en tanto se fundamenta en su adjudicación de prueba documental, pericial y testimonial. Por todo lo anterior, somos del criterio que no se cometió el octavo error.

**V.**

Por los fundamentos que anteceden, se modifica la *Sentencia* apelada, a los fines de reducir los honorarios al 25% otorgados al palio del Código de Seguros, *supra*. Esto redunda en una sentencia ascendente la suma total de **$1,916,760.78**.[54] Así modificada, se confirma la *Sentencia*.

---

[53] *Véase* entrada núm. 143, pág. 21, en SUMAC-TPI (énfasis suplido).

[54] Según la *Sentencia*, el monto previo a sumar los honorarios era de **$1,533,408.62**. Al reducir el porcentaje de la sentencia utilizado para establecer los honorarios en virtud del Código de Seguros, *supra*, corresponde calcular nuevamente dichos honorarios. Calculamos el 25% de la sentencia, lo cual equivale a **$383,352.16**. Con ello, determinamos que el monto final a pagar es **$1,916,760.78** ($1,533,408.62 + $383,352.16).

Lo acordó el Tribunal y lo certifica la Secretaria del Tribunal de Apelaciones. La Juez Lebrón Nieves disiente con opinión escrita.


Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones

Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL VIII

| | | |
|---|---|---|
| CONSEJO DE TITULARES DEL CONDOMINIO BOSQUE DEL RÍO<br><br>Apelado<br><br>V.<br><br>MULTINATIONAL INSURANCE COMPANY<br><br>Apelante | TA2026AP00135 | *Apelación* procedente del Tribunal de Primera Instancia, Sala Superior de Carolina<br><br>Caso Núm. TJ2020CV00013<br><br>Sobre: Incumplimiento de Contrato |

Panel integrado por su presidenta, la Juez Lebrón Nieves, el Juez, Pagán Ocasio y la Jueza Álvarez Esnard

### VOTO DISIDENTE DE LA JUEZ LEBRÓN NIEVES

En San Juan, Puerto Rico, a 4 de junio de 2026.

El 9 de febrero de 2026, Multinational Insurance Company (en adelante, la parte apelante) compareció ante este foro revisor mediante el recurso de apelación que nos atiene. Nos solicita que revoquemos la *Sentencia* emitida por el Tribunal de Primera Instancia el 30 de diciembre de 2025, notificada y archivada en autos el 8 de enero de 2026. Mediante el aludido dictamen el foro primario condenó a la parte apelante al pago a la parte apelada de **$1,016,997.03** por concepto de los *daños* producto del huracán María; *intereses por mora* en la suma de $**516,411.59** y el 33% de la suma de $1,533,408.62, equivalentes a **$506,024.84** de *honorarios de abogado.* Lo anterior para una suma total de **$2,039,433.46**. Dispuso, además, que la suma antes mencionada devengará el interés legal de 8.50%, a computarse desde la fecha de la notificación de la Sentencia y hasta que sea satisfecha. Asimismo, condenó a la parte apelante al pago de costas, a tenor de la Regla 44 de Procedimiento Civil, 32 LPRA Ap. V, R. 44.

**I**

En apretada síntesis, se desprende del expediente ante nuestra consideración, que el Consejo de Titulares del Condominio Bosque del Río (en adelante, la parte apelada o el "Consejo") presentó el 16 de enero de 2020, una *Demanda* contra la parte apelante por incumplimiento del contrato de seguro habido entre las partes. En particular, alegó que la parte apelante incumplió con los términos y condiciones de la póliza de seguro #88-CP-000313008-1 (la "Póliza") ante su reclamación para resarcir los daños ocurridos en el Condominio Bosque del Río, en Trujillo Alto, como consecuencia del paso del huracán María por Puerto Rico, el 20 de septiembre de 2017. La parte apelada arguyó que, la Póliza provee una cobertura para todos sus edificios y estructuras auxiliares por daños de hasta $29,106,676.00 sobre la base del costo de reposición. Añadió que, la Póliza cubre a la propiedad por los daños causados por vientos al contener un endoso que especifica que están sujetos a un deducible del 2% del valor de la propiedad asegurada. Alegó, además, que se vio forzada a contratar sus propios expertos y consultores para identificar los daños en la propiedad.

Asimismo, la parte apelada adujo que, la aseguradora se ha negado a pagar por los daños cubiertos, a pesar del tiempo transcurrido, razón por la cual, a la fecha de la presentación de la Demanda, la propiedad no había sido reparada. Consecuentemente, le solicitó al foro primario que le ordenara a la parte apelante pagar por: 1) la totalidad de los daños causados en la propiedad por el huracán María, bajo los Artículos 1077 y 1054 del Código Civil, 31 LPRA §§ 3052 y 3018; y (2) una cantidad por los daños resultantes del incumplimiento de la parte apelante con sus obligaciones en virtud de la Póliza y del Código de Seguros de Puerto Rico, según enmendado, 26 LPRA §§ 101 *et seq.*

En respuesta, el 30 de agosto de 2020, la parte apelante presentó *Contestación a Demanda,* en la que negó las alegaciones en su contra y afirmó que atendió diligentemente la reclamación en cumplimiento con la Póliza, las leyes y los reglamentos aplicables. Asimismo, levantó sendas defensas afirmativas fundamentadas principalmente en los términos y condiciones de la póliza.

Luego de acaecidos varios trámites de rigor, y según solicitado por las partes, el foro primario designó al señor Luis R. Esteves como Comisionado Especial (en adelante, el Comisionado) y le encomendó que realizara un informe sobre el valor de los daños ocasionados por el huracán María en el Condominio Bosque del Río. En particular, que realizara: (1) un desglose detallado del valor de los daños a "la propiedad" ocasionados por el huracán María el 20 de septiembre de 2017; (2) determinaciones sobre el ajuste de los daños conforme a la prueba que le fuere presentada por las partes en torno a los términos, límites asegurados, condiciones y exclusiones de la póliza expedida por la parte apelante; (3) un resumen de la prueba evaluada, considerada y excluida, previa determinación de este Tribunal; y, (4) una relación de determinaciones de hechos.

Asumida su encomienda, el 24 de marzo de 2025, se presentó la *Moción Presentando el Informe del Comisionado Especial.* El foro apelado ordenó la notificación del Informe Final del Comisionado Especial, de conformidad con la Regla 41.5(c) de Procedimiento Civil,[55] a los fines de que las partes presentaran sus objeciones, si alguna. En consonancia con lo anterior, el 16 de junio de 2025, la parte apelante interpuso ante el foro primario *Moción Notificando Objeciones al Informe del Comisionado Especial.* Mediante el aludido escrito, objetó y se opuso a la adopción del Informe del Comisionado Especial por realizar determinaciones de hechos claramente

---

[55] 32 LPRA Ap. V.

erróneas y no completar un inventario y avalúo de los daños que cumpla con los requisitos. Asimismo, le imputó violentar los términos y condiciones de la póliza al: a) utilizar publicaciones de FEMA no aplicables para determinar daños en ventanas; b) adjudicar costos de reemplazo sin evidencia del costo actual del reemplazo; c) adjudicar daños en apartamentos cuyos titulares informaron no haber sufrido daños. A su vez, la parte apelada presentó *Moción para que el Honorable Tribunal Adopte el Informe del Comisionado Especial.*

Subsiguientemente, el 5 de noviembre de 2025, el foro primario celebró una vista argumentativa. Luego de escuchar los planteamientos de las partes en torno al Informe Final emitido por el Comisionado Especial, le ordenó a este que actualizara los costos reconocidos al 2025.

Luego de actualizado el aludido informe, según ordenado, el Tribunal *a quo* determinó que la parte apelada no logró demostrar que las determinaciones del Comisionado fueran "claramente erróneas", según exige la Regla 41.5(c) de Procedimiento Civil, *supra*, para apartarse de un informe de comisionado especial. Finalmente, adoptó en su totalidad el Informe Final del Comisionado Especial, y concedió los remedios adicionales solicitados por la parte apelada, incluyendo los ajustes por inflación, el pago de intereses por mora y honorarios de abogados.

En el caso ante nuestra consideración, la Mayoría del Panel, eminentemente, confirmó la *Sentencia* emitida por el foro primario, que a su vez, acogió el Informe rendido por el Comisionado Especial. En esencia, la Mayoría optó por únicamente modificar el aludido dictamen, a los fines de reducir los honorarios al 25% otorgados al palio del Código de Seguros, *supra*. Así modificada, confirmó la *Sentencia* apelada.

La Juez que suscribe está en desacuerdo con el proceder de la Mayoría, toda vez que, como en adelante se explica, tal actuación implica avalar una flagrante violación a los términos y condiciones de la póliza en controversia. Lo anterior, en patente contravención a nuestro ordenamiento jurídico sobre la materia.

**II**

*El Contrato de Seguro*

Nuestro Tribunal Supremo de Puerto Rico ha reconocido el alto interés público con el que está investido el negocio de seguros en Puerto Rico, "debido al papel que juega en la protección de los riesgos que amenazan la vida o el patrimonio de los ciudadanos" y "la extraordinaria importancia que juegan los seguros en la estabilidad de nuestra sociedad". *R.J. Reynolds v. Vega Otero,* 197 DPR 699, 706 (2017) (citando a *Natal Cruz v. Santiago Negrón et al.,* 188 DPR 564, 575 (2013)).

Generalmente se define el seguro como un contrato por el que una de las partes (conocida como asegurador), a cambio de una contraprestación que suele pagarse en dinero, ya sea en una suma global o en diferentes momentos durante la duración del riesgo, se compromete a realizar un determinado pago, normalmente en dinero, en caso de destrucción o daño de algún bien en el que la otra parte (conocida como asegurado) tiene un interés. 1 Couch on Insurance 3d Sec. 1:6 (2021). Por su parte, el Código de Seguros de Puerto Rico define un contrato de seguro como un "contrato mediante el cual una persona se obliga a indemnizar a otra o a proveerle un beneficio específico o determinable al producirse un suceso incierto, previsto en el mismo". Art. 1 del Código de Seguros de Puerto Rico, 26 LPRA sec. 102. *San Luis Center Apts. et al. v. Triple S,* 208 DPR 824, 830-831 (2022).

Debido a la gama de actividades económicas en las cuales una persona se expone a lo largo de su vida, se han creado distintos tipos

de seguros para atenuar los riesgos inherentes a cada actividad. Es así por lo que contamos con seguros de vida, salud, empleo y propiedad, entre otros. En particular, en la controversia ante nuestra consideración, las partes suscribieron un contrato de seguro de propiedad.

En Puerto Rico, el negocio de los seguros está investido de un gran interés público debido a la importancia, la complejidad y el efecto en la economía y estabilidad de la sociedad que representa. *Rivera Matos, et als.* v. *ELA, et al.*, 204 DPR 1010, 1019 (2020).[56] La industria de los seguros está extensamente reglamentada mediante la Ley Núm. 77 de 19 de junio de 1957, según enmendada, conocida como el Código de Seguros de Puerto Rico, 26 LPRA sec. 101 *et seq.* Allí se define *seguro* como el contrato mediante el cual una persona se obliga a indemnizar a otra o a pagarle o proveerle un beneficio específico o determinable al producirse un suceso incierto previsto en el mismo. 26 LPRA sec. 102. *Carrasquillo Pérez v.et al. v. CMS*, 214 DPR 1033, 1049-1050 (2024).

En el ámbito comercial, "el negocio de seguros se convierte en uno de los principales soportes que permite amortiguar los giros violentos de incertidumbre propios del mercado, aminora sus efectos y permite un crecimiento más estable de la economía". *Rivera Matos et al. v. Triple-S et al.*, supra, pág. 1019; *R.J. Reynolds v. Vega Otero*, supra, pág. 707. Igual trascendencia tiene en el ámbito individual, al proteger o amortiguar los riesgos que experimenta el ciudadano promedio, producto de las inclemencias del tiempo, accidentes y enfermedades, entre otros.[57]

Los términos que se encuentran en el contrato de seguros están contenidos en la póliza por escrito. Art. 11.140(1) del Código de Seguros, 26 LPRA sec. 1114(1). Nuestra última instancia judicial

---

[56] Véase, además, *R.J. Reynolds v. Vega Otero*, supra, pág. 706.
[57] *San Luis Center Apts., et al v. Triple-S*, supra, pág. 832.

ha expresado que cuando nos corresponda interpretar las cláusulas de un contrato de seguro "el propio Código de Seguros pauta la norma que ha de regir nuestra función hermenéutica". *R.J. Reynolds v. Vega Otero*, supra, pág. 707. "A esos efectos, dispone que los contratos de seguro se interpretan globalmente, a base del conjunto total de sus términos y condiciones, según expuestos en la póliza". Íd. Véase Art. 11.250 del Código de Seguros, 26 LPRA sec. 1125. Los términos de los contratos de seguro se rigen por las normas de interpretación aplicables a los contratos en general. Couch, supra, Vol. 2, Sec. 22:1 esc. 1 ("Insurance policies are controlled by the rules of construction that are applicable to contracts generally").[58]

Sobre este particular, el Código de Seguros de Puerto Rico dispone que el contrato de seguro deberá interpretarse [...] a base del conjunto total de sus términos y condiciones, según se expresen en la póliza y según se hayan ampliado, extendido, o modificado por aditamento, endoso o solicitud adherido a la póliza y que forme parte de ésta". Art. 11.250 del Código de Seguros, 26 LPRA sec. 1125. *Carrasquillo Pérez v.et al. v. CMS*, supra, pág.1050.

Ahora bien, si los términos de la póliza son claros, específicos y ausentes de ambigüedad, su cumplimiento será obligatorio, pues el contenido del contrato constituye la **ley entre las partes**.[59] Los términos de una póliza se reputarán claros cuando su lenguaje sea específico, cuando no dé lugar a dudas o cuando no sea susceptible a distintas interpretaciones.[60] A su vez, "los términos de las pólizas de seguro deben ser generalmente entendidos en su más corriente y usual significado, sin atender demasiado al rigor gramatical, sino al uso general y popular de las voces". *Carrasquillo Pérez v.et al. v. CMS*, supra, pág.1050.

---

[58] *Id.*
[59] *Id.*; *Echandi Otero v. Stewart Title*, 174 DPR 355, 369 (2008).
[60] *San Luis Center Apts. et al. v. Triple S*, supra, pág. 833.

Nuestra Máxima Curia ha señalado que, [s]i bien es cierto que el propósito de todo contrato de seguros es la indemnización y protección en caso de producirse el suceso incierto previsto en el mismo, **"[a]l determinar cuáles son los riesgos cubiertos por una póliza de seguro es necesario considerar si en el contrato figura una cláusula de exclusión"**. (Negrilla suplida en el original).[61]

Como es sabido, las cláusulas de exclusión contenidas en las pólizas de seguro tienen el propósito de "limitar la cubierta establecida en el acuerdo principal y disponen que el asegurador no responderá por determinados eventos, riesgos o peligros." *Monteagudo Pérez v. ELA*,172 DPR 12 (2007). La función de este tipo de cláusula es "eliminar la responsabilidad que tiene el asegurador de indemnizar por las pérdidas resultantes de los riesgos excluidos." *Echandi Otero v. Stewart Title*, 174 DPR 355 (2008).

Si bien es cierto que, como regla general, las exclusiones son desfavorecidas, por lo que deben de interpretarse restrictivamente en contra del asegurador y de este modo resguardar la esencia propia del seguro, "si los términos de las cláusulas de exclusión son claros y aplican a una situación determinada, no podrá responsabilizarse a la aseguradora por aquellos riesgos expresamente exceptuados". *Rivera Matos, et als. v. ELA, et al.*, supra, pág. 1021.

Los términos del contrato de seguro se consideran claros cuando su lenguaje es específico, sin que dé lugar a dudas o ambigüedades, o sin que sea susceptible a diferentes interpretaciones. *Id.* Sin embargo, debido a que el contrato de seguro es un contrato de adhesión, las cláusulas dudosas o ambiguas deberán interpretarse liberalmente en beneficio del asegurado. *Id.*

---

[61] *Id.,* págs. 1050-1051.

Se denomina póliza el documento donde se consignan los términos que rigen el contrato de seguro.  Art. 11.140(1) del Código de Seguros, 26 LPRA sec. 1114(1).  Conforme dispone el propio Código de Seguros, en primera instancia las cláusulas de una póliza se interpretarán de manera global, examinando el conjunto total de las disposiciones, términos y condiciones vigentes a la fecha que se juzgue relevante.  Art. 11.250 del Código de Seguros, 26 LPRA sec. 1125. *Rivera Matos, et als.* v. *ELA, et al.*, supra, pág. 1020, citando con aprobación a *R.J. Reynolds v. Vega Otero, supra*; y *Viruet et al. v. SLG Casiano-Reyes*, 194 DPR 271 (2015).

En consecuencia, corresponde interpretar el lenguaje plasmado en la póliza en su acepción de uso común general, sin ceñirse demasiado al rigor gramatical.  *Jiménez López et al. v. Simed,* 180 DPR 1 (2010); *S.L.G. Francis-Acevedo v. SIMED*, 176 DPR 372 (2009); *Echandi Otero v. Stewart Title*, 174 DPR 355 (2008).  De igual forma se examinarán las cláusulas desde la óptica de una persona normal de inteligencia promedio que fuese a adquirir el seguro. *S.L.G. Ortiz-Alvarado v. Great American,* 182 DPR 48 (2011).  De este modo, se garantiza que el asegurado que adquiere una póliza reconoce el alcance de la protección del producto que ha comprado. *Rivera Matos, et als.* v. *ELA, et al.*, supra.

Por último, la Alta Curia ha aclarado que: "Primeramente, corresponde al asegurado el peso de establecer que su reclamación está comprendida dentro de las disposiciones del contrato de seguro, mientras que es la aseguradora quien tiene que evidenciar que aplica alguna exclusión.  Véase A.D. Windt, <u>Insurance Claims and Disputes</u>, 6ta ed., St. Paul, Minn., Ed. Thompson Reuters, 2013, Sec. 9.1, págs. 9-2 y 9.6 (2013).  Véanse, además, *Echandi Otero v. Stewart Title*, supra; *Martínez Pérez v. U.C.B.,* 143 DPR 554 (1997)." *Rivera Matos, et als.* v. *ELA, et al.*, supra.

**III**

Inconforme con el dictamen del foro primario, la parte apelante acude ante este foro revisor y le imputa al foro *a quo* incidir al incluir en su Sentencia: 1) honorarios de abogados; 2) intereses por mora; 3) un aumento por inflación; 4) intereses por mora simultáneamente con un aumento por inflación. Asimismo, 5) al determinar que MIC tenía una obligación de pago; 6) al determinar que MIC tenía que resolver la reclamación para el 10 de enero de 2018; 7) al concluir que el trato de MIC fue injusto, carente de razonabilidad, que MIC forzó al Consejo a presentar la demanda, que MIC no cumplió con sus obligaciones al amparo de la póliza y el Código de Seguros, y que entabló una defensa hostil. Por último, 8) al no considerar las objeciones específicas de MIC al informe del Comisionado Especial.

Por considerarlos medulares y en gran medida, dispositivos de la controversia que nos ocupa, esta Juez centrará su discusión, de manera conjunta, en los señalamientos de error *tercero, quinto, séptimo y octavo*. Veamos.

Un análisis ponderado y sosegado de los términos y condiciones de la póliza demuestra que, con su proceder, el foro primario obvió los términos y condiciones del contrato de seguro. Veamos.

Mediante su dictamen, el foro apelado acogió el *Informe Final* del Comisionado Especial e incorporó a su Sentencia, las determinaciones de hechos recogidas en el mismo. Entre estas, determinó que "[l]a póliza es una póliza de tipo 'a todo riesgo' (*all-risk*), por lo que cubre todo tipo de daño a la propiedad asegurada, a menos que el tipo de daño esté expresamente excluido".

Claro está, una póliza *todo riesgo* cubre los daños ocasionados por todo riesgo, salvo aquel riesgo que fuere excluido, esto es:

> The second drafting method is for the coverage part of the policy to state that the policy covers all causes of loss to the subject matter insured **except those causes which are specifically excepted, or persons or interests excluded from the policy.**

En el caso ante nuestra consideración, el foro *a quo* incidió ordenarle al Comisionado Especial actualizar el valor de la pérdida al 2025 y, además, al añadirle un costo de inflación que no fue pactado por las partes contratantes. Al así hacerlo, se utilizó indiscriminadamente el concepto de valor de reemplazo (*replacement cost*) sin tomar en consideración que para que proceda la aplicación de la cubierta opcional de costo de reemplazo, **la póliza requiere reparar, reconstruir, reemplazar** la propiedad dañada con propiedad de tipo y calidad similar ("*with other Property of the like kind and quality*"). Como sabemos, los términos y condiciones de la póliza deben ser interpretados tomando en consideración el contexto de la cubierta en su totalidad.

Una minuciosa y ponderada revisión del expediente, y particularmente, de la póliza en controversia, revela que la parte apelante emitió la póliza número 88-CP-000313008-1, a favor de la Asociación de Residentes del Condominio Bosque del Río, con fecha de vigencia desde el 29 de agosto de 2017 hasta el 29 de agosto de 2018. La aludida Póliza incluyó la cubierta Costo de Reemplazo (*Replacement Cost*).

Las cláusulas y condiciones de la póliza en cuestión son claras. En particular, el inciso A (4) dispone lo relativo a la cubierta adicional y en el sub inciso (e), establece lo pertinente al incremento en el costo de construcción. En específico, dispone:

**e. Increased Cost Of Construction**

**(1)** This additional Coverage applies only to buildings to which the Replacement Cost Optional Coverage applies.

[.....]

(7) With respect to this additional Coverage:

(a) We will not pay for the Increased Cost of Construction:

(i) Until the property is actually repaired or replaced, at the same or other premises; and

(ii) Unless the repair or replacement is made as soon as reasonable possible after the loss or damage, not to exceed two years. We may extend this period in writing during the two years.

(b) If the building is repaired or replaced at the same premises, or if you elect to rebuild at another premises, the most we will pay for the increased Cost of Construction, subject to the provisions of e.(6) of the Additional Coverage, is the increased cost of construction at the same premises.

Asimismo, la póliza establece con meridiana claridad, lo pertinente al pago y la valoración de la pérdida.[62]

## 4. Loss Payment

a. In the event of loss or damage covered by this Coverage Form, at our option, we will either:

(1) Pay the value of lost or damaged property;

(2) Pay the cost of repairing or replacing the lost or damaged property, subject to **b.** below;

(3) Take all or any part of the property at an agreed or appraisal value; or

(4) repair, rebuild or replace the property with other property of like kind and quality, subject to **b.** below.

We will determine the value of lost or damaged property, or the cost of its repair or replacement, in accordance with the applicable terms of the Valuation Condition in this Coverage Form or any applicable provision which amends or supersedes the Valuation Condition.

b. The cost to repair, rebuild or replace does not include the increased cost attributable to enforcement or compliance with any ordinance or law regulating the construction, use or repair of any property.

[.....]

## 8. Valuation

---

[62] Véase, página 11 de 15 de la póliza.

We will determine the value of Covered Property in the event of loss or damage as follows:

a. At actual cash value of the time of loss or damage, except as provided in **b.** and c. below.

b. If the limit of Insurance for Building satisfies the Additional condition, Coinsurance, and the cost to repair or replace the damages building property is $2,500 or less, we will pay the cost of the building repairs and replacement.

The cost of building repairs or replacement does not include the increased cost attributable to enforcement of or compliance with any ordinance or law regulating the construction, use or repair of any property.  However, the following property will be valued at the actual cash value, even when attached to the building:

(1) Awnings or floor coverings;

(2) Appliances for refrigerating, ventilating, cooking, dishwashing or laundering; or

(3) Outdoor equipment or furniture.

c. Glass at the cost of replacement with safety-glazing material if required by law.

A su vez, la aludida Póliza dispone lo pertinente a las cubiertas opcionales.  Respecto a la cubierta adicional pertinente al caso de marras sobre Costo de Reemplazo (*Replacement Cost*), la misma establece lo siguiente:

[.....]

**G. Optional Coverage**
[.....]

**3. Replacement Cost**

a. Replacement Cost (without deduction for depreciation) replaces Actual Cash Value in the Loss Condition, Valuation, of this Coverage Form.
[.....]

**d. We will not pay on a replacement cost basis for any loss or damage:**

(1) **Until the repair or replacement is made as soon as reasonable possible after the loss or damage.**
(*Énfasis suplido*).

[.....]

e. We will not pay more for loss or damage on replacement cost basis than the least of (1), (2), or (3), subject to f. below:

(1) The Limit of Insurance applicable to the lost or damaged property;

(2) The cost to replace the lost or damaged property with other property:

(a) Of comparable material and quality and

(b) Used for the same purpose; or

(3) The amount actually spent that is necessary to repair or replace the lost or damaged property... Énfasis subrayado nuestro.

La Juzgadora de primera instancia consignó en su *Sentencia Final* que: "Además, surge del expediente judicial que Multinational reiteradamente se negó a ofrecer pagar cuantías acordes a los daños sufridos por el Consejo dentro de un término razonable. Tal actuación por parte de Multinational ha resultado en un proceso litigioso extenso que ha obstruido al Consejo obtener una compensación justa por los daños causados por el huracán María a más de ocho (8) años del evento que activó la Póliza. Tales acciones, además, han causado que el Condominio tenga que incurrir en estos gastos de reparación en un periodo en el cual los precios de mano de obra y materiales de construcción son mayores a aquellos que existían al momento del evento que causó la pérdida.

Es meritorio destacar que, en el caso que nos ocupa, *no está en controversia* el que, según los términos y condiciones de la póliza, las partes acordaron la cubierta opcional de Costo de Reemplazo (Replacement Cost). Así surge de la determinación de hecho número 13, realizada por el Comisionado Especial y adoptada por el foro primario. En específico, la aludida determinación de hecho lee y citamos:

13. La Póliza requiere reparar, reconstruir, reemplazar la propiedad dañada *"with other property of the like kind quality"*.

Habida cuenta de lo anterior, para poder exigir el pago, la asegurada tenía la obligación de hacer la reparación o reemplazo de la propiedad dañada dentro de un término razonable luego de la ocurrencia del daño. Por otro lado, el recobro de dichos costos de reparaciones o reemplazos estará sujeto a los costos realmente incurridos.

No surge del expediente que la parte apelada haya cumplido con tal condición contractual, la cual es clara y libre de ambigüedades. Al ordenarle a la parte apelante a pagar bajo la cubierta de costo de reemplazo sin que se hayan cumplido las condiciones contractuales para dicho pago, el Tribunal ha vulnerado el principio fundamental de que el contenido del contrato constituye la ley entre las partes. *Carrasquillo Pérez v. Asociación*, 214 DPR 1033, (2024).

Por otro lado, el foro primario, al resolver bajo una interpretación desacertada del caso *Carpet & Rugs v. Tropical Reps*, 175 DPR 615 (2009), razonó que, la parte apelante renunció a sus defensas por haber hecho un ajuste y oferta de pago a la parte apelada. Empero, dicha determinación está reñida con los términos y condiciones de la póliza emitida a favor de la parte apelada, así como el estado de derecho vigente, principalmente, la legislación promulgada para atender, precisamente, las reclamaciones relacionadas al paso del huracán María por Puerto Rico.

Conforme de la determinación de hecho número 18 de la Sentencia, y citamos:

18. El 9 de abril de 2018, Multinational Insurance Company notificó al Consejo de Titulares un ajuste de la reclamación reconociendo que le debe al Consejo de Titulares la suma de $31,271.98 por concepto de la reclamación luego de aplicado el deducible correspondiente, sujeto a la deducción de adelantos previos.

Tampoco se puede obviar el hecho, recogido en la determinación de hecho número 19 de la *Sentencia* apelada, y citamos:

> 19. El 10 de abril de 2019, Multinational Insurance Company pagó un adelanto de $140,000.00 al Consejo de Titulares.

Por lo tanto, no estamos ante un caso en el que la aseguradora se haya negado a pagar el valor del ajuste notificado a su asegurado. Como se puede apreciar, dicho adelanto se efectuó en una etapa temprana de los procedimientos, sobre todo, tomando en consideración la complejidad de la reclamación de la que se trata.

Surge del expediente de autos que, mediante *Sentencia Parcial* del 24 de agosto de 2020, en atención a la *Moción en Solicitud de Desestimación* presentada el 13 de julio de 2020 por la parte apelante, así como la *Oposición a Moción en Solicitud de Desestimación* presentada el 27 de julio de 2020 por la parte apelada, el foro *a quo*, declaró Ha Lugar a la aludida *Moción en Solicitud de Desestimación* por entender que la Ley 242 de 27 de noviembre de 2018, tenía carácter prospectivo.

Como es sabido, nuestra Asamblea Legislativa aprobó la Ley 242, *supra*, precisamente, para atender la problemática existente en el ajuste y disposición de las reclamaciones por los daños provocados por el huracán María. Mediante dicha pieza legislativa, se enmendó Código de Seguros de Puerto Rico, a fin de disponer en el inciso (3) del Art. 11.150, lo siguiente:

> Toda póliza de seguros de propiedad, en la línea de negocios comercial o personal, deberá contener una estipulación o cláusula que disponga para la resolución de disputas relacionadas con el valor de la pérdida o daños en una reclamación a base del proceso de "appraisal". Ello, a opción del asegurado y sin que limite la facultad del asegurado de acudir a los tribunales o algún foro administrativo directamente. A los efectos de lograr mayor uniformidad, se entenderá que el asegurador cumple con este requisito cuando la póliza contenga el lenguaje de la cláusula de "appraisal" dispuesto en el formulario de póliza establecida por el "Insurance Services Offices, Inc. (ISO)", de ser dicho

asegurador miembro de esa organización, o las guías promulgadas por la NAIC, de conformidad con lo dispuesto en el inciso (3) del Artículo 11.190 de este Código.[63]

Como ha destacado el Alto Foto, en virtud de esta disposición, se adoptó y viabilizó en nuestra jurisdicción el mecanismo de valoración o *appraisal*, como vehículo para la resolución de disputas en las reclamaciones bajo una póliza de seguros. A su vez, el Art. 11.190 del Código de Seguros nos ilustra sobre lo que implica, en términos prácticos, este procedimiento recién adoptado. A esos fines, indica que el proceso de *appraisal* es un mecanismo "para resolver desacuerdos exclusivamente relacionados con el valor de una pérdida o daños en una o más partidas de la reclamación en pólizas de seguros de propiedad en la línea comercial o personal".[64] Consecuentemente, y sin perjuicio de que el asegurado pueda iniciar una acción en los tribunales, se considera válida una estipulación o cláusula "que disponga que cualquiera de las partes podrá solicitar por escrito someter ante un árbitro imparcial y competente la resolución de disputas, en torno a la valoración de daños o pérdida en una reclamación en que el asegurador haya aceptado que está cubierta".[65]

Conforme de su Exposición de Motivos, "[e]n ese sentido, la presente pieza legislativa posibilita el uso del proceso de valoración o "*appraisal*", para la resolución de conflictos en el pago de la cuantía correspondiente a reclamaciones de seguros de propiedad. El proceso de valoración o "*appraisal*" es un método en que las partes someten ante un árbitro imparcial los desacuerdos relacionados a la cuantía de una reclamación de seguros. El proceso de "*appraisal*" es un método alterno de resolución de conflictos, comúnmente usado en los demás estados de los Estados Unidos,

---

[63] 26 LPRA sec. 11153 (3).
[64] **26 LPRA sec. 1119.**
[65] *Con. Tit. Acquamarina et al. v. Triple-S*, 210 DPR 344, 360(2022).

que no suplanta o sustituye el derecho del asegurado a iniciar un procedimiento administrativo o una acción judicial en los tribunales. Este proceso está diseñado para brindar una alternativa rápida y de carácter no-contenciosa adicional, que facilite a las partes llegar a un acuerdo en el pago por el valor justo de la reclamación.[66]

Si bien es cierto que el foro *a quo* entendió que dicho estatuto era inaplicable al caso de marras[67], la Póliza establece que, en caso de desacuerdo entre las partes en la valoración de la pérdida, estas pueden utilizar el mecanismo de *appraisal.* "If we disagree on the value of the property or the amount of the loss, either may make written demand for an appraisal of the loss. In this event, each party will select a competent and impartial appraiser. The two appraisers will select an umpire. If they cannot agree, either may request that selection be made by a judge of a court having jurisdiction. [.....].[68]

Distinto a lo resuelto por el foro primario, la parte apelante, al efectuar su ajuste y valoración de los daños, actuó de conformidad con las cláusulas, términos y condiciones de Póliza. La misma establece que en caso de desacuerdo con el ajuste y valoración, las partes pueden someter el asunto ante un árbitro designado por el Tribunal, como en efecto, ocurrió en el presente caso.

La *Sentencia* emitida por la Mayoría, al no considerar la totalidad de cláusulas y condiciones esenciales de la póliza en cuestión, tiene el efecto de modificar los términos claros del contrato de seguro, contrario a los principios establecidos por nuestro ordenamiento jurídico. Como ha establecido nuestra más Alta Curia, en ausencia de ambigüedad, las cláusulas del contrato son obligatorias, pues no se admitirá una interpretación que vulnere el

---

[66] Véase Exposición de Motivos de la Ley 242-2018.
[67] Con posterioridad al dictamen del foro primario, declarando la desestimación de la causa de acción bajo la Ley 242, *supra*, y estando aún el proceso litigioso en este caso, nuestra Alta Curia le imprimió carácter retroactivo al aludido estatuto.
[68] Véase, acápite E (2) de la Póliza.

claro propósito y voluntad de las partes. *S.L.G. Francis- Acevedo v. SIMED*, 176 DPR 372, 387 (2009).

Una meticulosa revisión del expediente revela que, estamos ante una reclamación compleja que envuelve múltiples reclamos. Dada la naturaleza de la reclamación han surgido discrepancias entre las partes en torno al ajuste y valoración de la pérdida. Esta situación provocó que el foro primario designara un Comisionado Especial. Han sido varios los escollos para finiquitar el ajuste y resolución de la reclamación. Incluso, luego de realizado el estimado por el Comisionado designado, en una clara inobservancia de los términos y condiciones de la póliza el foro primario modificó la encomienda dada a este originalmente, para que revalorara la pérdida. Lo anterior, provocó un lamentable retraso, así como una fallida adjudicación y resolución del caso.

Por último, resulta meritorio destacar que, la Ley 242, *supra*, aprobada precisamente, en atención a las reclamaciones resultantes del huracán María no dispone, en modo alguno, la renuncia de las condiciones de la póliza como defensas, por parte de la aseguradora, tal como lo concluye la Mayoría del Panel en este caso. Por lo tanto, a juicio de esta Juez, no fue la intención del Legislador adoptar tal doctrina. Tampoco la jurisprudencia interpretativa más reciente sobre la materia hace acopio de dicha norma.

Por los fundamentos previamente esbozados, es la opinión de esta Juez que, la *Sentencia* emitida por la Mayoría—que confirma, en su gran mayoría, el dictamen del foro *a quo*— soslaya de manera impermisible, los términos y condiciones de la Póliza. Ello, a pesar de que la misma constituye el contrato entre las partes y por ende, en contravención al contrato entre las partes. Habida cuenta de lo anterior, no tengo otra alternativa sino disentir de tal curso de acción.

Por tanto, esta Juez revocaría la *Sentencia* apelada en su totalidad y devolvería el caso a la primera instancia judicial para que se efectúe la valoración de los daños, de conformidad con el contrato de seguro habido entre las partes. Asimismo, revocaría la imposición de costas, honorarios de abogado e intereses por mora, por entender que son improcedentes en derecho.

**GLORIA L. LEBRÓN NIEVES**
Juez de Apelaciones